[S. F. Nos. 7376, 7377. In Bank.—November 20, 1917.]

ASSOCIATED PIPE LINE COMPANY (a Corporation), Petitioner, v. RAILROAD COMMISSION OF THE STATE OF CALIFORNIA et al., Respondents.

ASSOCIATED OIL COMPANY (a Corporation), Petitioner, v. RAILROAD COMMISSION OF THE STATE OF CALIFORNIA et al., Respondents.

PUBLIC UTILITIES—OIL PIPE-LINES—APPLICABILITY OF STATUTES OF 1913, CHAPTER 327.—The provisions of Statutes of 1913, chapter 327, declaring certain pipe-lines to be public utilities, and subject to the provisions of the Public Utilities Act, apply only to those who by means of pipe-lines are engaged in the transportation of crude oil and its products to or for the public.

ID.—COMMON CARRIERS—DEFINITION.—A common carrier is one who offers to carry goods for any person between certain termini, and who is bound to carry for all who tender their goods and the price of carriage.

ID.—OWNERS OF PIPE-LINES—INSUFFICIENCY OF EVIDENCE.—On an application to review action of the state Railroad Commission, the evidence in this case is found insufficient to support the finding by the commissioners that the petitioners, who were the owners and operators of certain oilpipe-lines, were common carriers of crude oil and its products, the record disclosing no action on the part of either petitioner constituting an irrevocable dedication of its property to a public use, such as the exercise of the right of

eminent domain, or that either petitioner had devoted its transportation facilities to indiscriminate public use for hire.

ID.—REGULATION AND CONTROL OF PRIVATE PROPERTY.—So long as one uses his property for private use, and does not devote it to public use, the public has no interest therein which entitles it to a voice in its control.

ID.—CONSTITUTIONAL LAW—MONOPOLY AND COMBINATION IN RESTRAINT OF TRADE—TAKING PRIVATE PROPERTY FOR PUBLIC USE.—Conceding the evidence to be sufficient to support the finding that the petitioners operating certain pipe-lines were operating them in an unlawful combination in restraint of trade, such fact could not warrant the taking of private property for public use without compensation.

ID.—PRIVATE PROPERTY—SUBJECTING TO PUBLIC USE—WHAT CONSTITUTES TAKING WITHOUT COMPENSATION.—Although tolls are allowed for actual service, the subjecting of property to the use of the public as common carriers constitutes a taking of the same.

ID.—STATUTES — POWERS OF RAILROAD COMMISSION — LIMITATIONS.— The Railroad Commission, as an instrumentality of the state, is authorized to supervise and regulate every public utility in the state and to fix tolls and charges, but it has no power to declare what shall constitute a public utility.

ID.—POWERS OF LEGISLATURE—DECLARING WHAT IS A PUBLIC UTILITY.— The legislature cannot by its edict make that a public utility which in fact is not, and take private property for public use by its fiat that the property is being devoted to a public use.

ID.—FEDERAL CONSTITUTION — FOURTEENTH AMENDMENT — OIL PIPE-LINES AS COMMON CARRIERS—INVALIDITY OF STATUTE—DUE PROCESS OF LAW.—Section 2 of the act, Statutes of 1913, chapter 327, which in effect declares that every corporation owning a pipe-line, through and by means of which it transports oil, is a common carrier of oil and subject to the provisions of the Public Utilities Act, is invalid, since such provision constitutes a taking of private property for public use without due process of law, prohibited by the fourteenth amendment to the federal constitution.

APPLICATIONS for Writs of Review to review and annul orders of the State Railroad Commission and its members.

The facts are stated in the opinion of the court.

Edmund Tauszky, Henley C. Booth, and Stanley Moore, for Petitioners.

Douglas Brookman, for Respondents.

VICTOR E. SHAW, J., *pro tem.*—These are proceedings in *certiorari* whereby each of the petitioners seeks the review and annulment of an order made by the Railroad Commission, requiring them to file with said commission schedules of their rates and charges for the transportation of crude oil, petroleum and the products thereof, by means of pipe-lines from the San Joaquin Valley oil fields in the state of California, and their rules and regulations in connection with such transportation.

The proceeding initiated of its own motion by the commission, under and by virtue of chapter 327 of the Laws of California, found in Statutes of 1913, page 657, is entitled: "In the Matter of the Compliance by Oil Pipe Lines with Provisions of Chapter 327 of the Laws of 1913, Declaring Certain Corporations, Associations and Individuals to be Common Carriers and Public Utilities, and Subject to the Provisions of the Public Utilities Act." Its declared purpose was an investigation to determine what corporations and associations were subject to the provisions of said act of the legislature. Pursuant to an order therein made, petitioners and a number of other corporations engaged in the transportation of crude oil and its products by means of pipe-lines, appeared before the commission at a stated time and place to show cause why each of them should not file with the commission the data and information therein specified, and otherwise comply with the law.

At the hearing had, evidence was adduced touching the subject of inquiry, upon which the commission made its findings and order which it is sought herein to have annulled.

Section 23, article XII, of the constitution of California, as amended in October, 1911, pursuant to which the act in question was adopted, is as follows:

"Every private corporation, and every individual or association of individuals, owning, operating, managing or controlling any commercial railroad, interurban railroad, street railroad, canal, pipe-line, plant, or equipment, or any part of such railroad, canal, pipe-line, plant or equipment within this state, for the transportation or conveyance of passengers, or express matter, or freight of any kind, including crude oil, or for the transmission of telephone or telegraph messages, or for the production, generation, transmission, delivery or furnishing of heat, light, water or power or for the furnish-

ing of storage or wharfage facilities, either directly or indirectly, to or for the public, and every common carrier, is hereby declared to be a public utility subject to such control and regulation by the railroad commission as may be provided by the legislature, and every class of private corporations, individuals, or associations of individuals hereafter declared by the legislature to be public utilities shall likewise be subject to such control and regulation. The railroad commission shall have and exercise such power and jurisdiction to supervise and regulate public utilities, in the state of California, and to fix the rates to be charged for commodities furnished, or services rendered by public utilities as shall be conferred upon it by the legislature, and the right of the legislature to confer powers upon the railroad commission respecting public utilities is hereby declared to be plenary and to be unlimited by any provision of this constitution.''

By this provision of the constitution the people of the state, however novel, if not startling, the proposition may be, have in clear and unmistakable language declared that *"every class of private corporations, individuals, or associations of individuals hereafter declared by the legislature to be public utilities shall . . . be subject to . . . control and regulation"* by the railroad commission, as provided by the legislature, and this without reference to the character of the business, whether it be a bootblack stand, grocery store or agricultural pursuit conducted in a purely private capacity; and further that "the right of the legislature to confer powers upon the railroad commission respecting public utilities is hereby declared to be plenary and to be unlimited by any provision of this constitution.''

Acting in pursuance of the power so conferred, the legislature adopted the act referred to as chapter 327, section 3 of which provides that "any pipe-line constructed, acquired, owned, operated, maintained, managed or controlled by any private corporation or individual or association of individuals for any of the purposes or under any of the conditions specified in section 1 or section 2 of this act, is hereby declared to be a public utility and subject to the provisions of the Public Utilities Act.'' Referring to section 1, divided into four subdivisions, we find that by subdivisions designated (a), (b), and (c) the legislature declares to be common carriers and subject to the provisions of the Public

Utilities Act, every private corporation, individual, or association of individuals, (a) engaged in transporting crude oil, petroleum or the products thereof through a pipe-line, *"directly or indirectly, to or for the public, for hire, compensation or consideration of any kind paid, given, extended or received, directly or indirectly, for such transportation"*; (b) any like person or body *"in favor of whom the right of eminent domain exists,"* engaged in such transportation to or for the public for hire, through a pipe-line *"constructed or maintained upon, along, over or under any public highway"*; (c) any corporation, individual, or association of individuals transporting crude oil, petroleum or the products thereof, to or for the public, for hire, *"or otherwise"* by means of a pipe-line *"constructed, operated or maintained across, upon, along, over or under 'the right of way of any railroad corporation or other common carrier required by law to transport crude oil, petroleum or products thereof, as a common carrier."* Restated, subdivision (a) of section 1 embraces only those engaged in the business of transporting oil as common carriers. Subdivision (b) is the same as subdivision (a), except that the act in its operation is restricted to those in whom the power of eminent domain exists (though not exercised) and whose pipe-lines are constructed over public highways. Subdivision (c), retaining the provision that the transportation be for the public for hire, adds, after the word "hire," the words "or otherwise," and restricts the operation of the provision to pipe-lines constructed along the rights of way of common carriers required to transport oil. It thus appears that subdivisions (a), (b), and (c) of section 1 apply solely and alone to those who, by means of pipe-lines, are engaged in the transportation of crude oil and its products to or for *the public.*

As bringing the petitioners within the provisions of these subdivisions, the commission found as a fact that in the transportation of crude oil and its products by means of pipe-lines from the San Joaquin Valley, petitioners were common carriers thereof, or, in the language of the statute, they were engaged in transporting such articles *"to or for the public for hire."* In our opinion, there is no evidence to support this finding as to either of the petitioners.

In his work on Carriers, Mr. Moore, at page 20 (volume 1), defines a common carrier as one who "holds himself out as

such to the world; that he undertakes generally and for all persons indifferently to carry goods and deliver them for hire; and that his public profession of his employment be such that if he refuse, without some just ground, to carry goods for any one, in the course of his employment and for a reasonable and customary price, he will be liable to an action.'' It is one who offers to carry goods for any person between certain termini and who is bound to carry for all who tender their goods and the price of carriage. Whether the business conducted by petitioners was that of a common carrier as thus defined was a question of fact, since it may not be said that the intention of the legislature in enacting subdivisions (a), (b), and (c) of section 1 of the act was to subject to public use pipe-lines engaged in the business of transporting oil other than for the public. Indeed, such legislation if attempted would have been futile, since under the fourteenth amendment of the federal constitution no state shall deprive any person of property without due process of law, and to take or devote private property to public use without compensation is such deprivation. The record discloses no action on the part of either petitioner which constitutes an irrevocable dedication of its property to a public use, such as the exercise of the sovereign power of the state in eminent domain. (Wyman on Public Service Corporations, sec. 214; *State ex rel. Turnpike Co.* v. *American & E. Commercial News Co.,* 43 N. J. L. 381.) Hence, in order to bring petitioners within the purview of the provisions under consideration, it must have been made to appear that they had voluntarily devoted their transportation facilities to the indiscriminate use of the public for hire, thus constituting them common carriers.

As to the Associated Pipe Line Company, the evidence shows that it was incorporated in August, 1907, ''for the acquisition, construction, leasing, owning, maintenance, and operation, *but not as a common carrier,* of pipe-lines for transportation of oil within the state of California, together with necessary pumping stations thereunder.'' At the time in question the Southern Pacific Company was, through a subsidiary company known as the Kern Oil & Trading Company, having charge of its oil bureau, engaged in developing oil lands owned by it in Kern County, the production from which was intended for its own use, and, as a means of delivering the oil so produced to points along its line of railroad, it joined with

the Associated Oil Company in the construction of two pipe-lines, the aggregate daily carrying capacity of which, in 1913, was thirty-eight thousand barrels. The cost of construction represented by the capital stock of the Associated Pipe Line Company was equally divided between the Associated Oil Company and the Kern Oil & Trading Company, and under their agreement, no charge being made for the transportation of oil other than the actual cost of operation and maintenance of the pipe-line, each was entitled to one-half the carrying capacity of said lines, one of which was known as the Rifle line, being 281 miles in length, and the other, known as the Hot line, 138 miles in length. At all the times since the construction of these pipe-lines the Kern Oil & Trading Company has devoted its one-half of the carrying capacity of said lines solely and alone to the transportation of oil produced by it and delivered to its proprietary company, the Southern Pacific Company, for the sole use of the latter. In 1913 such use amounted to nineteen thousand barrels per day, which was one-half of the full carrying capacity. The other interest in the capacity of said pipe-lines so owned by the Associated Oil Company has never at any time since the construction thereof been devoted to the carrying of oil or products other than those either produced by the Associated Oil Company or purchased in the oil field by it in its business of producing, buying, and selling oil, both in crude and refined forms. In 1913 its daily production of oil amounted to sixteen thousand five hundred barrels, and at the same time it was purchasing about thirty thousand barrels per day, which, as found by the commission, amounted to about twenty-two per cent of the entire production of the state. It thus appears that one-half of all the oil transported through these pipe-lines was produced by the Kern Oil & Trading Company, so owned by the Southern Pacific Company, for the use of the latter, and the other half so transported was either produced or bought by the Associated Oil Company, by whom it was transported and delivered to itself at the termini of said pipe-lines.

With reference to the other petitioner, Associated Oil Company: As stated, it had a daily production of sixteen thousand five hundred barrels and acquired by purchase thirty thousand barrels per day, making a total of forty-six thousand five hundred barrels, hence its one-half the capacity of the Associated Pipe Line Company being only nineteen thou-

sand barrels per day, left an amount for transportation by other means of twenty-seven thousand five hundred barrels. For the purpose of such transportation, it, in addition to ownership in the Associated Pipe Line Company, owns a pipeline running from the oil fields to Gaviota, and one from the Coalinga field to Monterey, the capacity of each of which is some fifteen thousand barrels per day. At no time since the construction thereof has the Associated Oil Company transported any oil through either of these pipe-lines, save and except such as it produced, together with that so purchased in the field and transported for delivery to itself at the termini of said pipe-lines, where it was sold to consumers in its crude or refined form or reshipped to other points for sale to consumers. The only efficient means of transporting oil from the San Joaquin Valley oil fields, which in July, 1913, as found by the commission, amounted to some six million five hundred thousand barrels, was by means of pipe-lines of the petitioners and those of a number of other companies engaged in the transportation of oil, all of which product, except that produced by the Kern Oil & Trading Company and Associated Oil Company, together with the thirty thousand barrels per day purchased by said last-named company, was transported through and by means of such other independent pipe-lines in which petitioners had no interest.

We are unable to perceive anything in the facts established which does not compel the conclusion that petitioners were engaged in a purely private business of transporting oil through these pipe-lines. Respondent lays great stress upon a decision of the United States supreme court entitled *United States* v. *Ohio Oil Co.*, 234 U. S. 548, [58 L. Ed. 1459, 34 Sup. Ct. Rep. 956]. To our minds, there are many features of this case which clearly distinguish it from that at bar. In the Ohio Oil Company case it appears that the Standard Oil Company had acquired control of all pipe-lines to which the oil fields east of California were tributary, thus giving it a monopoly of the means of transportation; that a part of the pipe-lines constituting the system were in fact *common carriers*. Having thus made itself master of the fields without the necessity of owning them or producing any oil itself, it, through its subordinates, refused to carry oil unless the same was sold to it, or to its subsidiaries and through them to it, on terms dictated by itself. It was there held that, since sub-

ject to such condition of sale to it, the company *carried everybody's* oil to market, the act of Congress declaring the pipelines so operated to be common carriers was not a taking of the property for the use of the public, since upon the facts found such pipe-lines had been by the owners thereof devoted to public use. In the case at bar a large part of the oil transported through the pipe-lines by the Associated Oil Company is produced by it. The amount of thirty thousand barrels per day purchased bears a comparatively small proportion to that produced in the oil fields tributary to its lines. The fact of such limited purchase, in competition with a number of other oil pipe-line companies to which said oil field is tributary, cannot, under the opinion in the Ohio Oil Company case, however interpreted, be deemed to constitute it a common carrier, or engaged in transporting oil for the public. Indeed, the opinion of the supreme court in the case of *United States* v. *Ohio Oil Co. (Uncle Sam Oil Co.)*, found in the same book (page 561), is authority for holding the contrary view. The fact that "the business is such that the public needs the use in the same, and that the conduct of the same is a matter of consequence," as found by the commission, is immaterial to the question. In one of the so-called elevator cases, that of *Munn* v. *Illinois*, 94 U. S. 113, [24 L. Ed. 77], it is said: "When, therefore, one *devotes his property* to a use in which the public have an interest, he in effect grants to the public an interest in that use, and must submit to be controlled by the public for the common good, to the extent of the interest he has thus created." But so long as he uses his property for private use, and in the absence of devoting it to public use, the public has no interest therein which entitles it to a voice in its control. Other cases to the same effect are *Budd* v. *New York*, 143 U. S. 517, [36 L. Ed. 247, 12 Sup. Ct. Rep. 468]; *Weems Steamboat Co.* v. *People's Co.*, 214 U. S. 345, [16 Ann. Cas. 1222, 53 L. Ed. 1024, 29 Sup. Ct. Rep. 661]; *Monongahela Nav. Co.* v. *United States*, 148 U. S. 336, [37 L. Ed. 463, 13 Sup. Ct. Rep. 622]; and *Del Mar Water etc. Co.* v. *Eshleman*, 167 Cal. 666, [140 Pac. 591, 948]. Indeed, our attention is directed to no authority in this state or elsewhere holding otherwise.

Subdivision (d) of section 1 embraces everyone "owning, using, operating, managing or controlling, directly or indirectly, or participating in the ownership, use, operation,

management or control, directly or indirectly, under lease, contract of purchase, agreement to buy and sell, or other contractual or tacit agreement or arrangement of any kind or character whatsoever, of any pipe-line, or pipe-lines, or any part of any pipe-line, or pipe-lines, plant or equipment, or pipe-line system, or any part of any pipe-line system, for the transportation of crude oil, petroleum or the products thereof, of and from, or of, or from any oil field or place of production within the state of California, to any distributing, refining, or marketing center or reshipping point therefor within said state, whereby, or under, or through which, directly or indirectly, such corporation, or any corporation or association of corporations, or individual or association of individuals secures, or is enabled to secure, or attempts to secure, or tends to secure, the control of, or monopoly of the purchasing of, or the control of, or monopoly of the transportation of such crude oil, petroleum or the products thereof.''

As bringing petitioners within this provision of the act, the commission found that ''the purpose of chapter 327 of the Laws of 1913 is to terminate and prevent a monopoly in the oil pipe-line business''; and found as a fact that the Associated Oil Company and Associated Pipe Line Company, together with three other companies named as engaged in like business, ''have secured the control and monopoly of the transportation of crude oil, petroleum and the products thereof from the San Joaquin Valley oil fields''; and that while section 5 of the act excepts from the provisions thereof companies, individuals, and associations the nature and extent of whose business is not of public interest or consequence, ''the five companies (among which were petitioners) serving the San Joaquin Valley fields cannot be regarded as coming within the exception,'' and further found as a fact that the nature and extent of the business of said five companies, including petitioners, ''are such that the public needs a use in the same and the conduct of the same is a matter of public consequence.''

The finding as to the control and monopoly secured by petitioners is attacked upon the ground of insufficiency of evidence to support the same. The evidence touching the subject is most meager and unsatisfactory. In effect it shows that five companies, including petitioners, operating pipe-lines in transporting oil, a part of which was produced by

each of them, were also buyers of crude oil in the fields from the independent producers thereof, who, since none of said companies transported oil other than that produced by themselves or such as they acquired by purchase, had no efficient means of shipping their oil to market, and hence contracted to sell the same to some one of those companies at prices agreed upon; that there was no agreement, tacit or otherwise, shown to exist between the companies as to the price which they should pay in contracting for the purchase of oil; that during most of the time the production of oil was largely in excess of the demand therefor, and little if any difference was paid by the companies in contracting for the purchase of oil; hence convenience and economy in delivery of the oil both as to the purchaser and buyer might well be deemed a controlling factor in making such contracts. While the position of petitioners and owners of the other pipe-lines gave them, as found by the commission, an advantage over the independent producers in transporting their product, thus affording an opportunity enabling them to enter into an unlawful combination in restraint of trade, our attention is directed to no evidence which in the slightest degree tends to establish such fact.

However this may be, and conceding the evidence ample to support the finding, such fact cannot warrant the taking of private property for public use without compensation for which no provision is made or contemplated. True the exaction of tolls for actual service will be allowed, but there are elements of damage due to the subjection of the property to the public service not covered by charges for service performed for which no compensation is made. That subjecting petitioners' property to the use of the public as common carriers constitutes a taking of the same, admits of no controversy. "Whenever a law deprives the owner of the beneficial use and free enjoyment of his property, or imposes restraints upon such use and enjoyment that materially affect its value, without legal process or compensation, it deprives him of his property within the meaning of the constitution. . . . It is not necessary, in order to render the statute obnoxious to the restraints of the constitution, that it must in terms or in effect authorize the actual physical taking of the property or the thing itself, so long as it affects its free use and enjoyment, or the power of disposition at the will of the owner."

(*Forster* v. *Scott,* 136 N. Y. 577, [18 L. R. A. 543, 32 N. E. 976] ; *Monongahela Nav. Co.* v. *United States,* 148 U. S. 312, 336, [37 L. Ed. 463, 13 Sup. Ct. Rep. 622].) Under the Public Utilities Act the Railroad Commission, as an instrumentality of the state, is authorized to supervise and regulate every public utility in the state, with power to fix tolls and charges exacted for the service performed; but it has no power to declare what shall constitute a public utility. But this, argues respondent, is a function of the legislature. Not so. The legislature possesses no such power. It cannot by its edict make that a public utility which in fact is not, and take private property for public use by its fiat that the property is being devoted to a public use. If under the broad language used in section 23, article XII, of the constitution, that "every class of private corporations, individuals, or associations of individuals hereafter declared by the legislature to be public utilities shall . . . be subject to . . . control and regulation" of the Railroad Commission, the legislature can by its mere fiat, without notice or opportunity to be heard, and in the absence of any provision for compensating the owner thereof for damage, subject petitioner's pipe-lines to the demands of the public because the *private use* thereof *tends* to create a monopoly or *enables* the owner thereof to *secure* a monopoly, it can with equal propriety declare a grocer or dry-goods store employing more than a specified number of clerks to be a public utility; or, without such or any qualifications, declare that *all pipe-lines* used in transporting oil shall be common carriers of oil. Indeed, as to corporations, this is precisely what it has attempted to do by section 2 of the act, which provides that every corporation owning a pipe-line, through and by means of which it transports oil, is declared to be a common carrier and subject to the provisions of the Public Utilities Act; the only limitation thereon being, as provided in section 5, that it shall not apply where the nature and extent of the business is such that the public needs no use in the same. That such provisions constitute a taking of private property by the state for public use, without due process of law, which is prohibited by the fourteenth amendment to the federal constitution, must be conceded. Mr. Lewis in his work on Eminent Domain, third edition, section 11, says: "A law which authorizes the taking of private property without compensation, . . . cannot be

considered as due process of law in a free government.''
(*Chicago etc. R. R. Co.* v. *Chicago,* 166 U. S. 226, [41 L. Ed.
979, 17 Sup. Ct. Rep. 581].)

1. The evidence is insufficient to justify the finding that
petitioners in operating their pipe-lines in transporting oil
came within the provisions of subdivisions (a), (b), and (c)
of section 1 of the act.

2. Subdivision (d) of section 1 and section 2 of the act are,
except perhaps as to corporations acquiring such pipe-lines
after the passage thereof, unconstitutional, and in violation of
the fourteenth amendment to the federal constitution, in that
they contemplate the taking of private property in the ab-
sence of any provision made  for compensating the owners,
and without due process of law.

Our conclusion renders it unnecessary to consider other
grounds upon which petitioners attack the action of the Rail-
road Commission.

The orders, in so far as they affect petitioners, are annulled.

Sloss, J., Melvin, J., Henshaw, J., and Shaw, J., concurred.