[L. A. No. 13384. In Bank.—December 30, 1932.]

THE PEOPLE, Appellant, v. G. M. DUNTLEY, Respondent.

U. S. Webb, Attorney-General, and Warner I. Praul, Deputy Attorney-General, for Appellant.

Hugh Gordon and Arlo D. Poe for Respondent.

SHENK, J.—This is an appeal from a judgment for the defendant in an action to recover highway transportation taxes.

During the years 1928 and 1929 the defendant was engaged in the business of transporting gasoline and crude. oil products between various points throughout the southern part of the state by means of autotrucks for hire. This action was commenced to recover a tax levied against the defendant by the State Board of Equalization, amounting to five per cent of the gross receipts from the operations of the defendant during the year 1928 and accruing penalties.

The state bases its claim to the tax under section 15 of article XIII of the Constitution, and section 3664aa of the Political Code. The constitutional section provides, so far as pertinent, that any person or company owning, operating or managing any trucks or autotrucks used in the business of transportation of property "as a common carrier for compensation over any public highway in this state between fixed termini or over a regular route" shall be taxed exclusively for highway purposes and shall pay annually to the state a tax upon the franchises, trucks or

automobile equipment, and other property used exclusively in the operation of the business in this state, equal to five per cent of the gross receipts from operation; and that such taxes shall be in lieu of all other taxes and licenses, state, county and municipal, upon the property enumerated.

Political Code, section 3664aa, and subsequent sections, provide the machinery for the ascertainment, levy and equalization of the tax by the State Board of Equalization, the payment thereof to the state treasurer, and the enforcement of payment by action in the name of the state. The tax for any one year is based on the gross receipts from operations during the preceding year, and the State Board of Equalization is granted authority, among other things, to ascertain the amount of the tax by an examination of the books of the operators. Pursuant to this authority the State Board of Equalization caused an audit to be made of the records of the defendant showing his operations for the year 1928. The audit disclosed gross receipts for that year, subject to tax, in the sum of $293,153.08. Suit was brought for five per cent of the amount and penalties.

Upon the trial the plaintiff offered in evidence a certified copy of the assessment-roll. Under the statute this established a *prima facie* case on behalf of the plaintiff. The defendant did not question the amount of the tax, but interposed the defense that he was not subject to any tax for state purposes and introduced evidence in support of his claim. The court found: "II. That in the conduct of said business, said defendant, G. M. Duntley, did not offer to the public to carry oil, gasoline or other liquid oil products or any commodities whatsoever and did not undertake generally, for all persons indifferently, to haul or transport oil, gasoline or liquid oil products or other commodities; that in the operation of said business said defendant transported property only for a limited number of persons, firms and corporations selected by said defendant and only pursuant to agreements for such transportation entered into in each instance prior to performing such transportation service; that the persons, firms and corporations for whom such transportation service was rendered did not constitute any distinct part or class of the general public; that in the course of said business said defendant did not haul or transport any property without

first having entered into a special agreement with the shipper thereof for such transportation; that frequently and at numerous times said defendant, in the course of his said business, declined and refused to haul shipments of oil, gasoline and other oil products offered to him for transportation; that said defendant did not advertise to the public generally that he was engaged in the business of transporting oil, gasoline, oil products or any other commodities whatsoever and did not solicit generally for such business; that said defendant did not publish or maintain any schedule or rates and charges for the transportation service rendered by him in the course of said business; that the rates charged and collected by said defendant for his said transportation service were in every instance fixed by agreement with the shippers. III. That in the operation of said transportation business, said defendant did not maintain regular schedules, either as to time, routes or termini, but, on the contrary, defendant operated his trucks at such times and between such points as were required by his agreements with shippers and over such routes as best suited his convenience; that the points of origin and destination of the shipments, transported by said defendant were scattered throughout the southern portion of the state of California from Imperial Valley points on the south to points in the Owens Valley and in the southern portion of the San Joaquin Valley on the north.''

The court concluded that the business of the defendant in 1928 was not that of transportation of property as a common carrier for compensation over public highways in this state between fixed termini or over a regular route, and that the assessment and levy attempted to be imposed upon him was illegal and void.

 The question presented is whether the foregoing findings are supported by the evidence. It necessarily requires an examination of the record. In support of the assessment-roll the plaintiff also introduced the report of the board's auditors taken from the records of the defendant and showing his 1928 operations. During that year the defendant operated twenty-five tank trucks and twenty-five tank trailers. The report classified the defendant's operations into six major routes, designated as regular routes, with the gross revenue from each, and arranged in schedules.

Schedule "A" classified the regular routes as follows: Harbor route (between the city of Los Angeles and Harbor points); Bishop route (between Los Angeles and Bishop, via Mojave); Imperial Valley route (between Los Angeles and Imperial Valley including Yuma); Coast route (between Los Angeles and Ventura, Santa Barbara, etc.); Ridge route (between Los Angeles and Newhall, Saugus, etc., over the Ridge road); and San Diego route (between Los Angeles and San Diego). Under a separate heading was placed the item of "Miscellaneous Hauling, not over a regular route, non-taxable", the gross revenue from which was $52,681.53. Schedule "B" listed the customers on each route and the revenues from each customer. On the Harbor route there were twenty-one customers; on the Bishop route, five customers; on the Imperial Valley route, sixteen customers; on the Coast route, fourteen customers; on the Ridge route, eight customers; and on the San Diego route, seven customers. With very few exceptions the customers were oil, gas or refining companies. Eighty-five per cent of the defendant's business was with the five major oil companies, namely: Union Oil Company, Shell Oil Company, Standard Oil Company of California, Western Oil & Refining Company, and Sunset Pacific Oil Company. He also hauled for the Fruit Growers Supply Company.

The hauling was done from the oil-fields, storage plants or refineries of the major oil companies to their gas and oil service station and customers located at various cities, towns and localities in the southern part of the state. The rates for the trucking were arrived at by agreement in advance of the service performed, between the defendants and his customers. The method of arriving at the rates to be charged is illustrated by the defendant's exhibit "G", which is a letter dated October 29, 1928, addressed to the defendant and signed by the traffic manager of the Standard Oil Company of California as follows: "Please quote me rates for trucking gasoline in truck and trailer lots from Vernon and Burnett to the following points." Then follows a list of numerous cities and towns in southern California. The defendant complied with the request by noting on the letter opposite the name of each place the rate submitted, and when the bid was accepted the commodity was hauled by the defendant at the specified rate. Another illustration is the

request for quotation of rates from the Shell Oil Company for trucking orchard heater oil from the Wilmington or Dominguez refineries to forty-seven towns in the so-called citrus belt, and the submission by the defendant of rates as requested, following which trucking was done by the defendant in accordance with the quoted rates.

The defendant, G. M. Duntley, testified that all of the trucking done by him was performed after a written or oral agreement with each shipper as to the rate to be charged and collected; that on occasion the rate quoted by the defendant would not be accepted and the trucking business would go to some other concern; that on other occasions he would refuse to quote a rate or to meet the rates requested, and that no steps were ever taken by any shipper to compel the defendant to haul at a particular or any rate; that on many occasions a part of the consideration for the trucking with the major companies was the requirement that the product of the latter be used by the defendant. When asked to state how frequently the defendant refused business Mr. Duntley stated: "Oh, we refused business every day. Sometimes they wanted us to take a load here or there—many times, we didn't have the equipment available. Many times we didn't want to haul for certain people. The major companies didn't want us to haul for bootleggers, so-called gasoline and crude oil products brokers, that they claimed were bootleggers, and they asked us not to haul for them, in many cases." He further defined bootleggers as "fellows who sit on the outside of the city and sell gasoline much below the city regulation for gasoline, and sell it much cheaper". He further testified that he hauled for some of those dealers after he started hauling gasoline in 1926, but that the major companies asked him to get away from that work, which he did generally, but that he hauled for some of them from time to time; that he refused at least fifty per cent of the business offered to him by the "outsiders", and that he did no work for any of them except in pursuance of a contract theretofore entered into.

The defendant owned oil spreading machines, and obtained, after the submission of bids, contracts for spreading oil over highways. The percentage of revenue from this work is not shown and the amount thereof is undoubtedly

included in the board's item of nontaxable revenue. The hauling done for the Fruit Growers Supply Company, consisted of the delivery of oil to individual orchardists at their ranches. The defendant originally owned numerous dump trucks, which he used under contracts with the Riverside Portland Cement Company in the handling of ore, and from which he received a considerable revenue. These dump trucks were later converted into tank trucks and trailers used in 1928. The books of the defendant disclosed that in 1928 he hauled for numerous individual customers in addition to the five major companies. This business was done under special contract, constituted odd loads in the main, and did not exceed ten per cent of the total business.

The defendant paid the state license fees required by the statute for commercial trucks. Under the schedule prescribed by law he paid a license fee of $143 on each tank truck and a like amount on each trailer. This was in addition to the personal property taxes and other local charges not imposed on common carriers. The defendant sold out his trucking business in 1930. During the time he was engaged in this business he was the president and general manager of the Motor Freight Terminal Company, a certificated public utility operating a general motor truck freight business between Los Angeles, San Luis Obispo and intermediate points and spent much of his time superintending that business. The public utility business so conducted was in nowise connected with the oil tank trucking business.

Other witnesses corroborated the testimony of Mr. Duntley to the effect that no tank trucking was undertaken except upon preliminary negotiations as to rates and points of service; that the principal business of the defendant was with the five major oil companies and the Fruit Growers Supply Company; that the defendant refused to bid for the business of other major oil companies and refused to take business generally, partly because the business was undesirable and partly because the five major oil companies insisted that the defendant's business be confined to their activities; that by no means did the defendant receive all of the business of such major companies; that the defendant never held himself out as a carrier willing to take the business of any or all who might apply and that no busi-

ness was done even with the principal customers of the defendant except after preliminary negotiations and arriving at an agreement as to the price for the service.

Representatives of the major oil company customers of the defendant testified that there was no regularity with reference to the service performed by the defendant; that the business given to the defendant depended largely on production and consumption or oil products; that they did business not only with other so-called contract carriers, but also with others who were certificated or common carriers, and that the defendant never represented himself as willing to handle all their business, but only such as might be the result of negotiation and contract.

In rebuttal the auditor of the State Board of Equalization testified that he assembled the data and prepared the schedules and routes specified therein solely from an examination of the records of the defendant; that he found in those records no routes specified by name, but allocated the business of the defendant arbitrarily to the several routes designated by him in his report to the board, using as a basis for his conclusions the ledger accounts, truck tickets and weigh bills submitted to him by the defendant. Those records showed the points of origin of the hauls and the destinations. The points of origin were numerous localities in the Los Angeles area and the points of destination spread out in fan shape and in varying distances from Los Angeles to San Diego, to the Imperial valley, to San Bernardino, to Bishop, to Bakersfield and to Santa Barbara. He arbitrarily placed each destination on a route from the point of origin which in his opinion the average truckmen would follow, and gave that route a name.

■ Before the defendant may be held for the gross receipts highway transportation tax two combinations of fact must exist. First, he must be a common carrier and operate between fixed termini or secondly, he must be a common carrier and operate over a regular route. Essential to each combination must be the fact that he is a common carrier. If he is not a common carrier the fact that he may operate between fixed termini or over a regular route would not subject him to the gross receipts tax.

■ The law of this state specifically recognizes a distinction between common carriers and private or contract

carriers. There can be no doubt that the state may so classify them for purposes of taxation and regulation. A state may subject a private or contract carrier to a state tax based upon the amount of business done, and it may impose the same burden of taxation on them as it does on common carriers. The state of Kansas in its 1931 Motor Vehicle Act provided the same state highway tax on both private or contract carriers and on common carriers, based upon the amount of business done and measured by the gross ton mile. The statute was upheld. (*Continental Baking Co.* v. *Woodring*, 286 U. S. 352 [52 Sup. Ct. Rep. 595, 76 L. Ed. 1155].)

The state of Texas, by statute, provides for certificates of public convenience and necessity to autotruck common carriers and requires that contract carriers shall obtain a permit from the Railroad Commission before they may lawfully conduct their business. In granting the permit the commission has power to fix the minimum rates to be charged by the contract carrier. Discretion is lodged in the commission to deny a permit if in its opinion ''the proposed operation of any such contract carrier will impair the efficient public service of any authorized common carrier or common carriers then adequately serving the same territory''. The statute declares that the business of operating as a motor carrier of property for hire along the highways of the state is one affected with the public interest. The Texas statute was upheld as a valid exercise of the legislative power of the state in regulating the use of the highways of the state, in an exhaustive opinion by the Supreme Court of the United States. (*Stevenson et al.* v. *Binford et al.,* (U. S.) 53 Sup. Ct. Rep. 181, 77 L. Ed. (Adv. Ops. 203, filed December 5, 1932.)

Unregulated truck transportation over the highways has developed a difficult and perplexing problem. The state of California has approached the problem of such regulation in a much more restricted fashion. Common carriers are required under the Auto Stage and Truck Transportation Act to obtain from the Railroad Commission a certificate of public convenience and necessity. Contract carriers are claimed to be without adequate regulation both as to rates of service, use of the highways, and interference with regulated common carriers. This is undoubtedly true, but the problem suggested is a legislative and not a judicial one. We

are here dealing not with a regulatory measure in its proper sense, but with a tax question arising under our Constitution and statutes.

This state has also approached the problem of imposing a tax on highway transportation from an angle different from and more restricted than that imposed by the state of Kansas, as above indicated. Prior to the enactment of section 15 of article XIII of our Constitution in 1926, auto-truck owners and operators, whether common carriers or not, were subject to taxation on the *ad valorem* basis provided by section 1 of article XIII of the Constitution. By the enactment of said section 15 autostage and autotruck common carriers of passengers and freight described in that section were removed from the operation of section 1. (*Los Angeles etc. Transp. Co.* v. *Superior Court*, 211 Cal. 411 [295 Pac. 837].) ▌ The tax provided by section 15 is a property tax the same as that imposed on public utilities generally by section 14 of article XIII. (*Alward* v. *Johnson*, 208 Cal. 359 [281 Pac. 389].) Two main objects were accomplished by the enactment of section 15. First, from the standpoint of the state, it withdrew the tax revenues from autotruck common carriers from local taxation and allocated such revenue exclusively to state highway purposes. And, secondly, from the standpoint of the common carriers involved, they were relieved of the payment of all other taxes and licenses, state, county and municipal. Section 15 was not entirely self-executing, but subdivision (b) thereof provided that the legislature should pass all laws necessary to carry the section into effect. Pursuant to this authorization the legislature in 1927 enacted section 3664aa of the Political Code, specifically providing for the levy and collection of the tax on common carriers as authorized by section 15 of article XIII of the Constitution. ▌ Since the latter section did not authorize the taxation of private and contract carriers for compensation on the basis of a percentage of their gross receipts and solely for highway purposes, or otherwise, the legislature of 1927 was apparently confronted with the problem of exacting from private or contract carriers a revenue for highway purposes approximating the gross receipts tax on common carriers. Accordingly in 1927 section 77 of the California Vehicle Act (Stats. 1927, p. 1708), was attempted to be amended to provide first for

the regular registration fee of three dollars for every motor vehicle and trailer, and secondly an additional registration fee on vehicles and trailers used for the transportation of passengers and freight for hire based on the weight and capacity of the truck and trailer. This 1927 enactment was subjected to the referendum and was approved by the electorate of the state at the general election held on November 6, 1928. Said section 77 was re-enacted in 1929 (Stats. 1929, pp. 508, 524), and has withstood the final test of judicial scrutiny. (*Carley & Hamilton* v. *Snook,* 281 U. S. 66 [50 Sup. Ct. Rep. 204, 74 L. Ed. 704, 68 A. L. R. 194].) Under said section 77 of the California Vehicle Act the contract carriers for compensation in this state pay a substantial revenue to the state. It is under this statute that the defendant paid during the year 1928 the sum of $143 on each truck and trailer. This exaction is necessarily in addition to the *ad valorem* taxes paid by the carrier each year under section 1 of article XIII of the Constitution and also in addition to whatever local taxes and license fees are imposed. The fees provided by section 77 of the California Vehicle Act are paid into the motor vehicle fund of the state and are available first for the support of the motor vehicle department and are then distributed to the state highway fund and to the several counties of the state in accordance with the provisions of the statute. These funds must be used exclusively for road and highway purposes, including some support to the motor vehicle department.

The laws relating to the taxation of common carriers on the one hand and contract carriers on the other, have been referred to at some length for the purpose of indicating that in this and other similar cases pending, the general revenues of the state are not affected; that the Constitution and laws of the state recognize a distinction between autotruck common carriers and contract carriers for hire; that the Constitution by imposing the *ad valorem* tax, and the legislature by the enactment of section 77 of the California Vehicle Act are deemed to have imposed upon contract carriers a substantial equivalent of the gross receipts tax imposed on autotruck common carriers for hire; that the finding of the trial court that the defendant is not a common carrier, but is a contract carrier, has not resulted in an escape of substantial taxation on the part of the defendant and that from a prac-

tical standpoint the controversy presented appears to be, in its major aspect, whether the tax and license exactions on the defendant, and others similarly situated as contract carriers, shall inure to the public only in part for state highway purposes or shall inure in whole to the benefit of the state highway funds. It may be said in passing that if the fees and exactions of section 77 of the California Vehicle Act, plus the *ad valorem* taxes and license fees, are not a substantial equivalent of the gross receipts tax imposed on common carriers, the rates of the former are subject to change at the lawful will of the legislature.

It is plain to be seen that one of the main purposes of the contract carriers in declining to dedicate their property to public use and in resisting the efforts of the state to impose the status of a public utility upon them is to avoid, as to their business, the incidents of a common carrier, chief among which is perhaps the result that when their property is subjected to public use they become subject to the jurisdiction of the Railroad Commission under the Auto Stage and Transportation Act, in which event the discretion is vested in the Railroad Commission to grant or deny a certificate of public convenience and necessity to a common carrier. If one be denied, the common carrier as such must go out of business entirely. If it be granted, the rates and charges and services are subject to regulation by the Railroad Commission. If it had been the intention of the people of the state to subject all carriers, whether public or private, to regulation by the Railroad Commission, the Constitution could have so provided, as was done by general statute in the state of Kansas. Not having done so, the refusal of a carrier in good faith to dedicate his property to public use and his insistence upon his right to operate as a contract carrier under the exactions imposed by law upon him in that capacity, would seem to be entitled to respect. (*Frost* v. *Railroad Com.*, 271 U. S. 583 [46 Sup. Ct. Rep. 605, 70 L. Ed. 1101, 47 A. L. R. 457] ; 3 Pond on Public Utilities, 4th ed., sec. 727, p. 1454.)

Of course, where a carrier is in fact and law a common carrier masquerading as a private or contract carrier, he should be declared to be a common carrier and be held to his duties and responsibilities as such. But in this case there is no charge or showing of bad faith on the part of

the defendant. The assumption of a false position on the part of a carrier is tantamount to fraud on his part and when the question of his good faith is not raised, bad faith on his part will not be assumed; and when such be the issue the burden is necessarily on the plaintiff to show that he is something other than he holds himself out to be.

■ We come now to the question whether the defendant, notwithstanding the findings of the court, is under the facts a common carrier in law. Neither the Constitution nor section 3664aa of the Political Code, nor the Auto Stage and Transportation Act, defines the term common carrier used therein. Section 2168 of the Civil Code defines a common carrier as follows: "Every one who offers to the public to carry persons, property or messages, excepting only telegraphic messages, is a common carrier of whatever he thus offers to carry." Section 2169 provides: "A common carrier must, if he is able to do so, accept and carry whatever is offered to him, at a reasonable time and place, of a kind that he undertakes or is accustomed to carry." Then follow sections 2170 to 2209, inclusive, of the Civil Code defining the duties, rights and liabilities of a common carrier. This court has followed the statutory definition. (*Walther* v. *Southern Pac. Co.,* 159 Cal. 769 [116 Pac. 51, 37 L. R. A. (N. S.) 235].) It has also approved the definition of Moore on Carriers (p. 20, vol. 1, 1st ed.; vol. 1, 2d ed., p. 22), as one who "holds himself out as such to the world; that he undertakes generally and for all persons indifferently to carry goods and deliver them for hire; and that his public profession of his employment be such that if he refuse, without some just ground, to carry goods for any one, in the course of his employment and for a reasonable and customary price, he will be liable in an action". (*Associated etc. Co.* v. *Railroad Com.,* 176 Cal. 518, 522 [169 Pac. 62, L. R. A. 1918C, 849].) "The authorities recognize two classes of carriers, viz., private carriers and common carriers. All persons who undertake for hire, to carry the goods of another, belong to one or the other of these classes. . . . The former are not bound to carry for any reason unless they enter into a special agreement to do so. The latter are bound to carry for all who offer such goods as they are accustomed to carry and tender reasonable compensation for carrying them, and if they refuse to perform

their obligation in this respect, they are liable to respond in damages. Private carriers are such as carry for hire and do not come within the definition of a common carrier.'' (4 R. C. L., p. 549, and cases cited.) ''A common carrier has been defined to be one who undertakes, for hire or reward, to transport the goods of such as choose to employ him, from place to place. The distinctive characteristic of a common carrier is that he undertakes to carry for all people indifferently; and hence he is regarded, in some respects, as a public servant. In order to impress upon one the character and impose upon him the liabilities of a common carrier, his conduct must amount to a public offer to carry for all who tender him such goods as he is accustomed to carry. The definition has not always been thus restricted, but the law applicable to common carriers is peculiarly rigorous, and it ought not to be extended to persons who have not expressly assumed that character, or by their conduct and from the nature of their business justified the belief on the part of the public that they intended to assume it.'' (4 R. C. L., p. 546, and cases cited.)

There are cases in this state involving the scope of the powers of the Railroad Commission in declaring, under the Constitution and the Public Utilities Act, certain concerns to be public utilities, and holding the power to have been lawfully exercised. (*Allen* v. *Railroad Com.*, 179 Cal. 68 [175 Pac. 466, 8 A. L. R. 249]; *Klatt* v. *Railroad Com.*, 192 Cal. 689 [221 Pac. 926].) In the Allen case it was said (p. 85), that ''to hold that property has been dedicated to a public use is 'not a trivial thing' . . . and such dedication is never presumed 'without evidence of unequivocal intention' ''. In the Klatt case this court said (p. 702) : ''The law requires that there shall be clear proof of an unequivocal intention to dedicate property to a public use before it can be taken from the owner.'' Those cases involved the question whether certain water companies were public service corporations. If they had been lawfully so declared the result would not have been that subsequently they could have been put out of business at the discretion of the Railroad Commission without compensation, but only that they would thereafter have been subject to control and regulation on the part of the commission. When business, such as that of the defendant herein, has been declared to be that

of a common carrier, and as such a public utility in its essential characteristics (*Western Assn. etc. R. R.* v. *Railroad Com.*, 173 Cal. 802 [162 Pac. 391, 1 A. L. R. 1455]), jurisdiction is vested in the commission to deny to such carrier the right to continue in business commenced since 1917, upon a showing and determination that public convenience and necessity do not require or justify such further operation. (*Motor Transit Co.* v. *Railroad Com.*, 189 Cal. 573 [209 Pac. 586].) This is true notwithstanding the fact that such operation has continued for a long series of years under his belief in good faith that he was a private carrier. When so denied the right, he is denied compensation for the right of which he has been deprived, presumably· on the theory that he had no such right in the beginning without public sanction and he must then cease to do business at least as a common carrier.

▮ When we come to the more specific question of subjecting a person to a tax on the ground that he has devoted his business and property to public use, another rule of law may not be disregarded, and that is, that in "the interpretation of statutes levying taxes, it is the established rule not to extend their provisions, by implication, beyond the clear import of the language used, or to enlarge their operations so as to embrace matters not specifically pointed out. In case of doubt they are construed most strongly against the government, and in favor of the citizen." (*Pioneer Express Co.* v. *Riley*, 208 Cal. 677, 687 [284 Pac. 663, 667].)

▮ The findings of the trial court quoted in the earlier portion of this opinion are an admixture of findings of fact and conclusions of law. That this is so does not subject them to severe criticism, for the reason that the problem presented to the court was a mixed question of fact and law. Whether a carrier is common or private is primarily a question of fact in each case. (*Haynes* v. *MacFarlane*, 207 Cal. 529 [279 Pac. 436].) In so far as the findings of the trial court are of the facts they may not be said to lack substantial support. The only showing counter thereto is the arbitrary segregations and classifications of the auditor of the State Board of Equalization and the records on which his report was made which we deem insufficient to justify a reversal. As to the conclusions to be drawn from the facts found, it may not fairly be said that they are unreasonable under all of the

facts and circumstances appearing in the record. If it be assumed that the opposite conclusion might likewise have been supported on findings against the defendant, it would, of course, not change the result on this appeal. The determination that the record supports the findings and conclusions of the trial court that the defendant is not a common carrier renders it unnecessary to decide whether he conducted his operations between fixed termini or over a regular route. If those questions were resolved against the defendant, it would not follow that he would be subjected to the gross receipts tax, because of the absence of the essential element of a common carrier status.

The judgment is affirmed.

Seawell, J., Preston, J., Tyler, J., *pro tem.*, Langdon, J., Curtis, J., and Waste, C. J., concurred.