[Crim. No. 2327. Second Appellate District, Division Two.—April 7, 1933.]

THE PEOPLE, Respondent, v. WILLIAM HENRY, Appellant.

M. Lewis Lehman for Appellant.

U. S. Webb, Attorney-General, and James S. Howie, Deputy Attorney-General, for Respondent.

ARCHBALD, J., *pro tem.*—Defendant was charged in an amended information with the crime of violation of section 2, chapter 638, Statutes of 1931 (Deering's Gen. Laws, vol. 2, p. 2545, Act 5130b). From the judgment entered on a verdict of guilty and from an order denying his motion for a new trial he has appealed.

It is urged that the evidence does not sustain the verdict, in that it does not show a violation of the act.

C. V. Wellman and Robert J. Herron, two of the principal witnesses for the prosecution, were shown a certain advertisement appearing in a Los Angeles newspaper on or about June 16, 1932, reading as follows: ''Continental Travelers Club. We will contact you with reliable people driving in every direction. 629 West Eighth St.; Trinity 0368.'' They were told to go to the address given and attempt to buy a ticket from Los Angeles to San Francisco. The address was that of the Morgan Hotel, and on the mezzanine floor they found two gentlemen and a lady, behind desks. A conversation ensued, which they were not permitted to relate while on the stand, the appellant not being present at the time, but it appears that as a result thereof the men proceeded to the Ford Hotel, in Los Angeles, and were seated in the lobby of that establishment when appellant appeared and inquired if they were the two gentlemen who wanted to go to San Francisco. They answered in the affirmative, whereupon appellant said he would return at about 3:30 or 4 o'clock P. M., and asked if they would be ready. He was told that they would be, whereupon he left the hotel but ''came right back, and he says, 'That is the car out there'. He pointed to a Cadillac sedan. . . . He says: 'That is the car we will go in.' He asked if that man up there had quoted us a price, and he was told 'No'. So he says, 'It will be $6.00.' And I said, 'For each of us? Apiece?' and he said, 'Yes. Is that satisfactory?' I says, 'It is O. K.'.'' The evidence further shows that appellant returned to the Ford Hotel at about 4:30 P. M. with several bags and suitcases strapped on the carrier of the Cadillac and one man riding in the rear seat; that Wellman and Herron got in and appellant drove to Fifth St. and Towne Avenue, where a young man who was waiting got in. With this young man was an older one who approached appellant and

handed him some money. At this time two motor vehicle inspectors who had been watching the car asked appellant where he was going, to which the latter replied, "You ought to know." The passengers in the car were then asked where they were going, and the young man who had just entered the vehicle said he was going to Fresno, or possibly Oakland; that he had agreed to share the expense, the amount to be later determined. The man who was in the car when Wellman and Herron got in said he was going to Seattle, and Wellman and Herron said they were going to San Francisco and had agreed to pay $6 for the trip. After the passengers in the car got out and removed their baggage there was still some baggage remaining on the rear of the car, which appellant said belonged to some people at the Balboa Hotel, in Los Angeles. The officers then went to that place with appellant and the remaining baggage was unloaded. Witnesses also testified that appellant had no license to operate as a motor carrier transportation agent and no certificate of public convenience and necessity.

Appellant testified that he was employed by William Finn, who was engaged in the transportation of passengers between Los Angeles and San Francisco, and that the Cadillac, though belonging to appellant, was to be driven to San Francisco by Finn; that he picked up the passengers for Finn and was to be paid by the latter for so doing; that he was employed on a commission basis for the purpose of "soliciting passengers for Mr. Finn". There is also evidence that Finn had no motor carrier transportation agent's license and did not possess a certificate of public convenience and necessity, and that the Railroad Commission had issued certificates of public convenience and necessity and motor carrier transportation agents' licenses only over two routes between Los Angeles and San Francisco, which are commonly known as the Coast Route and the Valley or Inland Route, the Pacific Greyhound Lines holding such certificates and licenses.

Section 1 of the act in question so far as material here, provides: "A motor carrier transportation agent within the meaning of this act is a person . . . who for compensation sells or offers for sale, or negotiates for, and/or holds himself out as one who sells, furnishes or provides, as principal or agent, transportation for persons over the public high-

ways of this state, when such transportation is furnished or is offered or proposed to be furnished by other than a carrier holding a valid certificate of public convenience and necessity issued by the railroad commission of the State of California permitting of such carrier transporting persons over such highways or any of them and between the points for which transportation is sold, or to the border line of the State of California when one of such points is without the state . . . '' Section 2 of the act makes it unlawful for any person "to engage in the business, or act in the capacity of a motor carrier transportation agent within the meaning of this act without first obtaining a license therefor".

■ The evidence to which we have called attention would seem to clearly justify the conclusion that appellant negotiated for and held himself out to the two named witnesses as one who furnished or provided, either as principal or agent, transportation over the highways of the state for compensation; that such transportation so offered was not to be furnished by a certificated carrier and that appellant had no license to act in the capacity of such an agent. It is true no money was paid by the two witnesses named, but it is not necessary under the act that the transportation be sold. It is sufficient if it be negotiated for, or if appellant held himself out as one who provided such transportation and that conclusion is susceptible of being drawn from the evidence presented. ■ Appellant argues, however, that the evidence does not take him out of the exception of section 1, which reads as follows: "This act shall not apply . . . to the movements of persons over highways or parts of highways not served by certificated carriers", inasmuch as such evidence does not show that any particular route was agreed upon and so it may have been contemplated that the car would be driven over some highway other than the two shown to be certificated. We think we may take judicial notice of the fact that the only route left between the two cities mentioned is via Mojave, Independence and Bishop, then over the mountains to near the Nevada line and thence approximately across the state from east to west into San Francisco—a route which it is inconceivable any person engaged in transporting passengers between Los Angeles and San Francisco would choose. In our opinion, however, the prosecution went further in its proof than was necessary.

The offense created by the statute is complete without such exceptions, which form no part of its description or definition but are merely matters of excuse and of defense (*Ex parte Hornef,* 154 Cal. 355 [97 Pac. 891]), and if appellant had in mind any possible route not covered by the two certificated ones he should have produced evidence thereof himself. The act in effect prohibits the sale, etc., without license, of transportation over the highways of the state, furnished or to be furnished by a private or contract carrier. Under the evidence appellant came squarely within such prohibition.

The jury had a right to conclude, in the absence of explanation by appellant, that the money paid to the latter by the person who accompanied the young man who got into the car at Fifth St. and Towne Streets was in payment, in whole or in part, of his fare to Oakland, and we see no error in refusing to strike such evidence.

Nor do we see any error in the court's refusal to admit in evidence a copy of the judgment-roll in the case of *William Finn* v. *Groocox* (one of the arresting officers), case No. 231,931 of the Superior Court in and for the City and County of San Francisco, in which a restraining order was issued purporting to restrain said Groocox and other police officers of the city of Los Angeles from arresting Finn or any of his employees. That could have no possible bearing on whether or not an offense was committed in Los Angeles County.

The fact that appellant attempted to get a license and bond under the act to permit him to act as he did could not excuse his acting without such license, and evidence thereof was clearly immaterial. If such license was arbitrarily refused by the Railroad Commission a direct attack on its action should have been made.

It was not error for the court, during the closing argument of the district attorney, to permit that officer to reopen the case to introduce testimony relative to the two regular routes between Los Angeles and San Francisco being certificated. That was a matter in the discretion of the trial court and we see no abuse of it in so acting. (*People* v. *Anderson,* 57 Cal. App. 721 [208 Pac. 254].) The admitted testimony did not harm appellant even if it was not material to the People's case.

■ Appellant urges that he was simply Finn's employee, acting as chauffeur or operator of the car in picking up passengers in the city and taking them to the place where Finn himself would take charge for the purpose of driving them to San Francisco. It is sufficient to say that this was a matter of defense, for the consideration of the jury.

It is contended that the act violates the rights of appellant under (1) the "due process" and "equal protection clauses of the Federal and State Constitutions" (sec. 1, art. XIV, Amendments to the Constitution of the United States, and secs. 11 and 13, art. I, Constitution of California), and (2) the "Commerce Clause" (par. 3 of sec. 8, art. I, Constitution of the United States).

■ (1) Appellant urges that in effect the act compels a private or contract carrier of passengers for hire to become a common carrier and thus deprives him of his property without due process of law. We find nothing in the act which can be so construed. It is to be noted that it does not apply directly to the act of transportation. Its title is, the italics being ours: "An Act *to define motor carrier transportation agent;* to provide for the regulation, supervision and licensing *thereof,* and to provide for the enforcement of said Act and penalties for the violation thereof." It defines such agent to be a "person, firm or corporation who for compensation sells, offers for sale, negotiates for, or who holds himself out as one who sells, furnishes or provides, as principal or agent, transportation over the public highways of this state, *when such transportation is furnished, or is offered or proposed to be furnished by other than a carrier holding a valid certificate of public convenience and necessity issued by the railroad commission . . . permitting of such carrier transporting persons over such highways".* We think the class of transportation, the selling, negotiating for sale, etc., which is a very material part of such definition, is made clear by a reference to sections 2¼ and 50¼ of the Public Utilities Act, added by the amendments of 1927 (Stats. 1927, pp. 73, 74), the effect of which is to make a common carrier of every "passenger stage corporation", which includes (italics ours) "every corporation or person, their lessees, trustees, receivers or trustees appointed by any court, *engaged as a common carrier,* for compensation, in the ownership, control, operation or management" of any stage, autostage or other

motor vehicle used in the transportation of persons "over any public highway in this state between fixed termini, or over a regular route not exclusively used" in the limits of one municipality, or for the transportation of *bona fide* pupils of an institution of learning between their homes and such institution. Section 50¼ provides that no one included under such designation of "passenger stage corporation shall operate or cause to be operated any of such motor vehicles over any public highway of the state" without first having obtained from the Railroad Commission a certificate declaring that public convenience and necessity require such operation. In other words, by the express terms of the act the only carriers required to obtain such certificates of convenience and necessity are common carriers operating as such under the Public Utilities Act, who are subject to all the provisions thereof. The motor carrier transportation agent is one who furnishes, sells, etc., transportation furnished by a carrier other than one operating under a certificate of public convenience and necessity, viz., a common carrier. The only class of carriers left is private or contract carriers.

We think it is clear from a comparison of the act in question here with the Public Utilities Act that the legislature intended by the use of the words "certificated carriers" to mean carriers using some portion of the highways of the state to whom certificates of public convenience and necessity have been issued under section 50¼ of the Public Utilities Act, and possibly carriers using some portion of such highways to whom such certificates were issued under the act of May 10, 1917 (Stats. 1917, p. 330), as to routes over which such last-mentioned carriers were operating when the Public Utilities Act became effective. In other words, a certificated carrier is always a common carrier.

With that definition in mind we turn to the exceptions to section 1 of the act in question, which provides in part: "This act shall not apply to movements of persons when no compensation is paid . . . ; nor to the movements of persons over highways or parts of highways not served by certificated carriers." In other words, no license is necessary to negotiate for the transportation of persons for hire by private or contract carriers over highways or parts thereof not served by common carriers. The converse of

such statement shows the real meaning of the act, viz., that a license is necessary if the motor carrier transportation agent is negotiating for the sale, etc., of transportation over highways served by common carriers. There is nothing in such requirement, however, that prohibits a private or contract carrier from obtaining passengers to transport over such highways, if he or his agent have the license required under the act in question. "The law of this state specifically recognizes a distinction between common carriers and private or contract carriers. There can be no doubt that the state may so classify them for purposes of taxation" (*People* v. *Duntley*, 217 Cal. 150 [17 Pac. (2d) 715, 716]). We think on principle that it is equally true that a similar classification may be made for the purpose of regulating the sale of the transportation furnished or to be furnished by the private carrier, and the requirement of a license on the part of such agent to engage in such business would seem to be a reasonable regulation.

Appellant urges that under the provisions of the act in question relative to the issuance and revocation of such licenses by the Railroad Commission arbitrary powers are given to the commission. The provisions attacked seem reasonably designed to guarantee that licenses will be issued to responsible men of good reputation. The fact that the commission exercises some discretion does not invalidate such provisions. The commission may not "arbitrarily deny a license . . . nor is it presumed that it will do so without good cause, and if it should the courts are open for the correction of the wrong" (*Carter* v. *Stevens*, 211 Cal. 281, 293 [295 Pac. 28, 33]). No such question is before us now.

A more serious question, in our opinion, is the contention that the act violates the equal protection clauses of the state and federal Constitutions. Respondent's brief states that the purpose of the act was not alone to regulate the business of transportation for hire over certain state highways, but that it was intended to protect the public from the acts of financially and otherwise irresponsible persons soliciting such business whose "victims were often relieved of their money, started on their way, and then after the scheduled trip had begun they were either openly or covertly abandoned. This usually happened long before

their destination was reached and often soon after leaving'' the place of departure. We do not find that evidence of such happenings was presented in the instant case, but in our opinion the proviso of section 5 of the act, which reads as follows: ''Provided, however, that no license may be issued unless the applicant shall first provide a good and sufficient bond, policy of insurance or indemnity in favor of the people of the state of California which, among other conditions that may be prescribed by the railroad commission, *shall assure faithful performance of any contract or agreement of transportation negotiated by or entered into by the licensee''* (italics ours), shows the purpose of the legislature. The language of such section emphasized would seem to indicate without question that one of the purposes of the act is that suggested by appellant. Just why such assurance and protection would seem to be necessary on the much traveled highways used by the common carrier, and not on the remaining highways of the state, we fail to see. In our opinion we may safely assume that the highways excepted from the provisions of the act, i. e., ''those not served by certificated carriers'', are the ones less traveled and upon which the opportunity for the irresponsible person to abandon his passengers before completing the trip, and rob them of their money, would be infinitely greater. We cannot think that the legislature intended to leave any portion of the traveling public using the facilities of private or contract carriers on such highways unprotected. Considering the effect of such exception forces us to the conclusion that if it is permitted to stand the act in question becomes at once, not an instrument for the protection of the public and safety of the highways but one for the purpose of preventing to some extent at least the competition of private carriers on highways served by common carriers. This could be done, in our opinion, under the constitutional authority of the legislature, if such a provision is necessary for the safety and convenience of the traveling public, but it cannot be done under the guise of regulation. With such provision in the act it very clearly discriminates between the private or contract carrier, who is required to obtain a license and bond, who uses highways served by a common carrier, and the private or contract carrier who uses the other highways of the state and is not required to assume such burden. No

reasonable ground for such distinction seems to exist, and it certainly does not operate uniformly on all passengers transported by private carriers. Those who travel on highways served by common carriers have the assurance provided by a licensed agent and his bond that their trip will be completed, while those traveling on the remaining highways of the state are not so protected. We are of opinion that with such provision in the act it violates the equal protection clauses of both state and federal Constitutions.

■ The exercise of the police power of the state in the protection of the public safety and general welfare is entitled to every presumption in favor of its validity, and a regulation of the legislature in that regard will not be disturbed unless it can plainly be seen that the regulation has no relation to the purpose of the legislation but is a clear invasion of personal rights under the guise of such a protection. (*Ex parte Quong Wo,* 161 Cal. 220, 230 [118 Pac. 714].) ''The equal protection clause makes but one demand upon the state and gives to the state but one right. It is that the state shall make, execute and interpret its laws without discrimination. It must not grant rights to one which under similar circumstances it denies to another'' (*Title Guarantee & Trust Co.* v. *Garrott,* 42 Cal. App. 152, 155 [183 Pac. 470, 471]). This we think the act does in the provision here criticised. ■ Can such provision be declared unconstitutional and the remedy intended to be provided by the act retained? We think so. The act itself has the usual saving clause that if any section, subsection, sentence, clause or phrase thereof is held to be unconstitutional such decision shall not affect the validity of the remaining portions of the act. With such exception the act protects persons transported by private carriers over highways served by certificated carriers only, and without it the act affords the protection to *all* transported by private or contract carriers over *all* highways, by providing responsible transportation agents to deal with them and a bond or insurance policy that will assure the completion of their journeys. In our opinion such exception is unconstitutional. The act without it is complete, serves the purpose for which it was enacted, and does not violate constitutional rights.

■ (2) The question as to whether such act violates the commerce clause of the federal Constitution is not in-

volved here, as the transportation negotiated for in the instant case was to be entirely within the state.

█ As applied to intrastate transportation, we think the requirement of a bond or insurance policy is a valid regulation. (*In re Cardinal*, 170 Cal. 519 [150 Pac. 348, L. R. A. 1915F, 850]. See, also, the case of *Finn* v. *Railroad Com.*, 2 Fed. Supp. 891, decided by the District Court of the United States for the Southern Division of the Northern District of California on March 7, 1933, by a three-judge court under section 266 of the Judicial Code of the United States, sec. 380.)

Judgment and order affirmed.

Works, P. J., and Craig, J., concurred.

A petition by appellant to have the cause heard in the Supreme Court, after judgment in the District Court of Appeal, was denied by the Supreme Court on May 4, 1933.