[S. F. No. 18165. In Bank. Feb. 9, 1951.]

GORDON A. SAMUELSON et al., Petitioners, v. PUBLIC UTILITIES COMMISSION et al., Respondents.

Scott Elder for Petitioners.

Everett C. McKeage, Boris H. Lakusta, J. Thomason Phelps, Harold J. McCarthy, Halsey L. Rixford, John K. Power and Wilson E. Cline for Respondents.

Henry J. Bischoff, Douglas Brookman, Daniel P. Bryant, Charles W. Dooling, Hugh Gordon, Wyman C. Knapp, Frederick W. Mielke, J. Richard Townsend, Reginald L. Vaughan, Robert W. Walker and R. E. Wedekind, as Amici Curiae on behalf of Respondents.

EDMONDS, J.—For some years, Gordon A. Samuelson and Gilbert J. Munson, partners doing business as Circle Freight Lines, have held a certificate issued by the Railroad Commission of this state authorizing them to do business as a highway contract carrier. In a complaint filed with the successor commission by a railroad association and certain trucking corporations, the partners are charged with having operated as a common carrier without authority to do so. After a hearing, they were ordered to cease and desist from highway common carriage until they should obtain a certificate of public convenience and necessity.

In attacking this order by writ of certiorari, Samuelson and Munson assert that, as a matter of law, the uncontradicted evidence shows no violation of their permit. They also contend that the commission erroneously placed upon them the burden of proving that they conducted their business with "substantial restrictiveness." Aside from the question of the burden of proof, that limitation is challenged as being too indefinite to be applied with any certainty by a trucker who is endeavoring to avoid classification as a common carrier.

The following relevant facts are practically undisputed:

In 1946, the petitioners engaged in the business of transporting property for hire by auto truck over public highways, providing daily service between San Francisco and Oakland and nearby towns. With less frequency, they carried freight between the bay area and other places not more than 50 miles away. All of the service was of a permanent or indefinitely continuing nature. The entire operation was performed as a single, integrated business unit, with a common use of personnel, equipment and facilities.

Approximately three-fourths of the freight handled comprised electrical goods, drugs and liquors in equal proportions. The remainder consisted of a variety of other commodities. None of the traffic presented unusual features, and no such service was performed. The physical facilities and equipment used, the schedules observed, and the rates charged were substantially the same as those of a common carrier.

For some months prior to the hearing, about 30 firms, on the average, were served. When a customer dropped out for any reason, it was replaced by another, the total remaining at a fairly constant level. Altogether, 47 shippers had been or were being served by the partnership.

The partners did not solicit business. Their avowed purpose from the beginning was to restrict their operations, and the limit of 30 shippers was chosen after consideration of conflicting opinions from private counsel and members of the Public Utilities Commission. That limitation was adopted in good faith and not with a view to evade the law. The petitioners scrupulously sought at all times to stay within the law and to abide by the dictates of the commission. The petitioners' trucks could have carried more freight than was accepted. In selecting shippers, those were chosen who offered a substantial volume of tonnage, moving regularly, and whose business was considered profitable and convenient to the partners' operation. All other business was rigidly excluded.

Contractual arrangements with the shippers were nebulous in the beginning. Gradually oral agreements were entered into. At a later time, the partners obtained a written contract in a standard form with all but three of their customers. These three entered into an oral contract to the same effect as the one in writing.

The terms of the written contract required the shipper to tender, and the carrier to transport, for a specified period

and at the minimum rates prescribed by the commission, all shipments of designated commodities moving between specified points. There were provisions in regard to liability for loss or damage and respecting performance of service. The carrier exacted compliance with these terms and, on several occasions, terminated a contract because of failure to carry out its provisions. Also, the petitioners insisted on receiving payment only from those with whom it had a contract.

The operation was primarily a family one, the partners, related by marriage, doing the driving, and their wives performing the office work. In addition, one full-time and one part-time driver were employed.

From the beginning of the operation, the petitioners held a contract carrier permit issued as a matter of course. About a month prior to the filing of the complaint against them, they filed an application seeking a certificate of public convenience and necessity to operate as a highway common carrier between the points named.

Upon findings substantially in accordance with these facts, the commission held that there were no elements of restrictiveness which would indicate an intention to limit the scope of the operations. It said: "There is nothing unusual about the character of equipment used; the commodities transported present no unusual features, being those normally handled by common carriers; the drivers perform no unusual duties which differ from those ordinarily provided by the employees of common carriers, nor have they undergone any special course of training; no services are afforded in the handling of commodities which differ from those usually supplied by common carriers; the operation closely resembles the scheduled service performed by a common carrier; and the rates observed are uniform in their application among the shippers. Clearly, in none of these respects is there any substantial departure from the kind of operation normally supplied by a common carrier."

The determination as to lack of "substantial restrictiveness" was also placed upon the ground that the partners had not sufficiently limited their operations. The fact that they had chosen their shippers and endeavored to curtail the number of them was said to be immaterial. The commission also characterized as of no importance the evidence that there had been no development of business by solicitation and the refusal of proffered tonnage when there was space to carry it.

On the other side of the scales, the commission placed the partners' willingness, whenever shippers dropped out, to fill the ranks with new ones, the standard form of agreement, and the extension of service to shippers who had no individual or specialized requirements for the transportation of their products. Also, the practice of requiring the shippers to fulfill the obligations under their contracts and the cancellation of them upon a failure to do so were declared to be factors against common carriage. "Viewed against the background of the surrounding facts and circumstances," the commission concluded, "the number of shippers served . . ., now aggregating some thirty-two, is too large, we believe, to permit lawful operation as a private carrier." The partners were ordered to immediately discontinue service under their contract carrier permit. However, concurrently with that order, the commission issued a certificate of public convenience and necessity allowing the petitioners to operate as a highway common carrier between some, but not all, of the points which they were found to have served without authority.

In challenging the decision and order, the petitioners contend:

(1) The commission exceeded its jurisdiction in making its cease and desist order and by doing so deprived them of their property without due process of law in violation of section 13 of Article I of the California Constitution and the 14th Amendment of the Constitution of the United States. In support of this charge, it is argued that the decision is unsupported by any evidence that they operated trucks or transported property as a highway common carrier. All of the evidence, the petitioners assert, requires a finding that they denied service to the public and operated exclusively as a highway contract carrier.

(2) The decision, order, and determination are capricious and arbitrary in that they are contrary to the applicable statutes and at variance and inconsistent with the commission's instructions to the petitioners and its specifications of the characteristics of the several classes of highway carriers made generally by circular and otherwise.

(3) The negative finding of the commission of "lack of substantial restrictiveness" is based upon concepts arbitrarily injected into the subject by the commission without statutory or other authority. The criteria applied by the commission in its decision are illegal and capricious.

By answer, the commission contends that the one issue presented in this proceeding is the soundness of the definition and distinction applied by it to distinguish between highway common carriage and highway contract carriage. It is argued that the decision in *Pacific Southwest R. R. Assoc.* v. *Nielsen,* 49 Cal. P.U.C. 261, for the first time put into wholly articulate form the legislative concepts concerning the regulation of highway carriers. Assuming the soundness of the rule stated in the Nielsen case, the next question, says the commission, is whether it properly applied the rule to the facts shown in the present proceeding.

The commission categorically denies that it has ever deviated from the test of a holding out of service to the public in preference to some other theory. The term "holding out to serve the public or any portion thereof," says the commission, necessarily compels the inquiry whether the carrier has limited or restricted its service. If it has not done so, of necessity it must be deemed to have held out its service to the public indifferently and it is a common carrier.

The Public Utilities Act (Stats. 1915, ch. 91, p. 115, as amended [Deering's Gen. Laws, 1943, Act 6386]), provides: "The term 'common carrier,' when used in this act, includes every railroad corporation; street railroad corporation; express corporation; freight forwarder; dispatch, sleeping car, dining car, drawing-room car, freight, freight line, refrigerator, oil, stock, fruit, car loaning, car renting, car loading and every other car corporation or person, their lessees, trustees, receivers or trustees appointed by any court whatsoever, operating for compensation within this State. . . ." (§ 2 [1].) "The term 'public utility,' when used in this act, includes every common carrier, . . . where the service is performed for or the commodity delivered to the public or any portion thereof." (§ 2 [dd].)

"The term 'public or any portion thereof' as herein used means the public generally, or any limited portion of the public . . . for which the service is performed or to which the commodity is delivered, and whenever any common carrier . . . performs a service or delivers a commodity to the public or any portion thereof for which any compensation or payment whatsoever is received, such common carrier . . . is hereby declared to be a public utility subject to the jurisdiction, control and regulation of the commission and the provisions of this act. . . ." (§ 2 [ff].)

In 1935, the Public Utilities Act was amended by the addition of two sections reading as follows:

"The term 'highway common carrier' when used in this act means every corporation or person . . . owning, controlling, operating or managing any auto truck, or other self propelled vehicle not operated upon rails, used in the business of transportation of property as a common carrier for compensation over any public highway in this State between fixed termini or over a regular route. . . ." § 2¾ [a].)

"No highway common carrier shall hereafter operate or cause to be operated any auto truck, or other self-propelled vehicle not operated on rails, for the transportation of property as a common carrier for compensation on any public highway in this State except in accordance with the provisions of this act." (§ 50¾ [a].) The same section includes provisions for the supervision and regulation of highway common carriers by the Railroad Commission (§ 50¾ [b]), the issuance and regulation of certificates of public convenience and necessity by the commission, and the investigation by the commission of violations of the statute (§ 50¾ [c]).

The Highway Carriers' Act, which became effective in 1935 (Stats. 1935, ch. 223, p. 878, as amended [Deering's Gen. Laws, 1949 Supp. Act 5129a]), defines certain terms as used in it as follows:

*Highway Common Carrier,* ". . . every highway carrier operating as a common carrier subject to regulation as such by the Railroad Commission under the Public Utilities Act of the State of California as amended." (§ 1 [g].)

· *Radial Highway Common Carrier,* ". . . every highway carrier operating as a common carrier not heretofore subject to regulation as such by the Railroad Commission under the Public Utilities Act of the State of California, as amended." (§ 1·[h].)

*Highway Contract Carrier,* ". . . every highway carrier other than a highway common carrier as defined in subsection (g) and every radial highway common carrier as defined in subsection (h)." (§ 1 [i].)

Clearly neither the Public Utilities Act nor the Highway Carriers' Act defines the term common carrier, and both of these statutes adopt the common law distinctions between common and contract carriage. The parties agree on this major premise.

■ The term "common carrier" has been considered in many decisions of this court. In one of them it was said: "In

his work on Carriers, Mr. Moore, at page 20 (volume 1), defines a common carrier as one who 'holds himself out as such to the world; that he undertakes generally and for all persons indifferently to carry goods and deliver them for hire; and that his public profession of his employment be such that if he refuse, without some just ground, to carry goods for any one, in the course of his employment and for a reasonable and customary price, he will be liable to an action.' It is one who offers to carry goods for any person between certain termini and who is bound to carry for all who tender their goods and the price of carriage . . . The record discloses no action on the part of either petitioner which constitutes an irrevocable dedication of its property to a public use, such as the exercise of the sovereign power of the state in eminent domain . . . Hence, in order to bring petitioners within the purview of the provisions under consideration, it must have been made to appear that they had voluntarily devoted their transportation facilities to the indiscriminate use of the public for hire, thus constituting them common carriers." (*Associated Pipe Line Co.* v. *Railroad Com.*, 176 Cal. 518, 522, 523 [169 P. 62, L.R.A. 1918C 849].) To the same effect is *Forsyth* v. *San Joaquin Light etc. Corp.*, 208 Cal. 397, 404 [281 P. 620].

In *People* v. *Duntley*, 217 Cal. 150, 163-4 [17 P.2d 715], which concerned the question of whether the defendant was a common carrier and as such liable for a gross receipts highway transportation tax, the court said: "We come now to the question whether the defendant, notwithstanding the findings of the court, is under the facts a common carrier in law. Neither the Constitution nor section 3664aa of the Political Code, nor the Auto Stage and Transportation Act, defines the term common carrier used therein. Section 2168 of the Civil Code defines a common carrier as follows: 'Every one who offers to the public to carry persons, property or messages, excepting only telegraphic messages, is a common carrier of whatever he thus offers to carry.' Section 2169 provides: 'A common carrier must, if he is able to do so, accept and carry whatever is offered to him, at a reasonable time and place, of a kind that he undertakes or is accustomed to carry.' Then follow sections 2170 to 2209, inclusive, of the Civil Code defining the duties, rights and liabilities of a common carrier. This court has followed the statutory definition. (*Walther* v. *Southern Pac. Co.*, 159 Cal. 769 [116 P. 51, 37 L.R.A.N.S. 235]. . . .) It has also approved the definition of Moore on Carriers (p. 20, vol. 1, 1st ed.; vol. 1, 2d ed., p. 22), as one

who 'holds himself out as such to the world; that he undertakes generally and for all persons indifferently to carry goods and deliver them for hire; and that his public profession of his employment be such that if he refuse, without some just ground, to carry goods for any one, in the course of his employment and for a reasonable and customary price, he will be liable in an action.' (*Associated etc. Co.* v. *Railroad Com.*, 176 Cal. 518, 522 [169 P. 62, L.R.A. 1918C 849]. . . .) 'The authorities recognize two classes of carriers, viz., private carriers and common carriers. All persons who undertake for hire, to carry the goods of another, belong to one or the other of these classes. . . . The former are not bound to carry for any reason unless they enter into a special agreement to do so. The latter are bound to carry for all who offer such goods as they are accustomed to carry and tender reasonable compensation for carrying them, and if they refuse to perform their obligation in this respect, they are liable to respond in damages. Private carriers are such as carry for hire and do not come within the definition of a common carrier.' (4 R.C.L. p. 549, and cases cited.) 'A common carrier has been defined to be one who undertakes, for hire or reward, to transport the goods of such as choose to employ him, from place to place. The distinctive characteristic of a common carrier is that he undertakes to carry for all people indifferently; and hence he is regarded, in some respects, as a public servant. In order to impress upon one the character and impose upon him the liabilities of a common carrier, his conduct must amount to a public offer to carry for all who tender him such goods as he is accustomed to carry. The definition has not always been thus restricted, but the law applicable to common carriers is peculiarly rigorous, and it ought not to be extended to persons who have not expressly assumed that character, or by their conduct and from the nature of their business justified the belief on the part of the public that they intended to assume it.' (4 R.C.L., p. 546, and cases cited.)''

The United States Supreme Court reversed a decision of this court that a state can constitutionally affix to the privilege of the use of the state highways by private carriers, the condition precedent that the private or contract carrier must assume, against its will, the duties and liabilities of a common carrier. Such a requirement was held to be violative of the due process clause of the Fourteenth Amendment. The court said: ''The court below seemed to think that, if the state may

not subject the plaintiffs in error to the provisions of the act in respect of common carriers, it will be within the power of any carrier, by the simple device of making private contracts to an unlimited number, to secure all the privileges afforded common carriers without assuming any of their duties or obligations. It is enough to say that no such case is presented here; and we are not to be understood as challenging the power of the state, or of the railroad commission under the present statute, whenever it shall appear that a carrier, posing as a private carrier, is in substance and reality a common carrier, to so declare and regulate his or its operations accordingly.'' (*Frost* v. *Railroad Com.*, 271 U.S. 583, 599, 600 [46 S.Ct. 605, 70 L.Ed. 1101].)

Subsequently, in *Stephenson* v. *Binford*, 287 U.S. 251, 267, 268 [53 S.Ct. 181, 77 L.Ed. 288, 87 A.L.R. 721], the Frost case was explained in connection with the consideration of a Texas statute. It was then said that, as construed by this court, the California statute required the Frost Trucking Company to assume the status of a common carrier and submit to regulation as such, although the operator restricted his business to that of a private contract carrier. By its terms, the Texas statute dealt only with private contract carriers. Although the legislation imposed regulations upon them, the statute did not obligate the private carrier to dedicate its property to the business of public transportation and subject it to the duties and burdens imposed upon the common carrier. The decision in the Frost case might have been different, the United States Supreme Court declared, had the California statute not been interpreted by this court to impose upon a private contract carrier the status of the common carrier.

In the present case, it is not necessary to decide the extent of regulation to which a private contract carrier may or should be subjected. California has no statute such as that considered in the Stephenson case; the question is simply whether the Public Utilities Commission has properly classified the Circle Freight Lines as a common carrier.

In *Pacific Southwest R. R. Assoc.* v. *Nielsen*, 49 Cal. P.U.C. 216, it was charged that the respondent was operating as a highway common carrier without authority between certain points. Nielsen contended that his operations were those of a highway contract carrier. The commission found to the contrary and issued a cease and desist order. The basic issue

in the proceeding was stated by the commission as follows: "It is only a question of defining a highway common carrier and a highway contract carrier in terms precise enough that the division line between them can be readily discerned in the majority of cases upon a reasonable examination of the facts." (At p. 218.) Although recognizing the fact that no absolute or mathematical test could be devised, the commission said that its opinion "may serve to draw together many of the untied threads in the pattern of regulation in the trucking field and place upon a surer footing the public understanding of the views which this Commission entertains." (At p. 218.)

In reaching its conclusions, the commission said that the Public Utilities Act and the Highway Carriers' Act have adopted the common law distinction between common and contract carriage. The basic distinction between contract carriage and common carriage, it held, is the presence or absence of the performing of service for the public generally or any limited portion thereof. Whether there has been a holding out of such service is to be determined by an objective test which may or may not be consistent with the carrier's subjective intent. Without some degree of restrictiveness in a carrier's service, there can be no contract carriage. The quantum of restrictiveness must be substantial and considerable, and highway contract carriage, because of its essentially private quality, can obtain only in a relatively few instances.

"Substantial restrictiveness," which is an essential ingredient of highway contract carriage, the commission declared, may consist in the number of shippers served, or in the physical attributes of the operation or in a combination of both factors. But where the sole element of restrictiveness lies in the number of shippers served, such number must be extremely limited to stay within the realm of contract carriage. There must also be present circumstances indicating a stability in the identity of shippers, a continuity of service on substantially the same plane over a period, and a subjective intent consistent with restrictiveness of service. Mere efficiencies or conveniences of service do not suffice. And even where there is "substantial restrictiveness" in the physical attributes of an operation, service to too large a group may destroy the private character of the operation and make it common carriage.

The question as thus narrowed by the commission largely eliminates the factor of a dedication or holding out of service to the public or a portion thereof. Although recognizing that

by statute a public utility "includes every common carrier, . . . where the service is performed for or the commodity delivered to the public or any portion thereof" (§ 2[dd] Public Utilities Act), it does not apply that test when considering the scope of a permittee's operations. In defense of its position, the commission points out that, almost without exception, a carrier seeking to avoid common carrier status says that he has not and does not intend to hold his service out to the public and, in fact, refuses to do so in connection with some customers. Such conduct, the commission holds, does not keep him from being a common carrier.

■ . However, the common law test of common carriage, as repeatedly stated by this court, requires an unequivocal intention to dedicate property to a public use. The "substantial restrictiveness" doctrine excludes this intention, or at least reduces it to only incidental importance. ■ Furthermore, although the question of the carrier's intention is a primary factor in determining the character of carriage under the common law rule, the commission refuses to consider intent as tending to prove that status except where it happens to coincide with the determination that there was "substantial restrictiveness" in operations. Otherwise stated, intent is not a determinative factor in the event that it coincides with "substantial restrictiveness" and contract carrier status, but it may be of decisive importance in favor of common carrier status, regardless of other evidence which would justify, if not compel, a different conclusion.

The order is annulled.

Gibson, C. J., Shenk, J., Carter, J., Traynor, J., Schauer, J., and Spence, J., concurred.

Respondents' petition for a rehearing was denied March 8, 1951. Traynor, J., and Spence, J., voted for a rehearing.