[S. F. No. 20412. In Bank. June 28, 1961.]

BABE TALSKY et al., Petitioners, v. PUBLIC UTILITIES COMMISSION OF THE STATE OF CALIFORNIA et al., Respondents.

152

Donald Murchison for Petitioners.

William M. Bennett, Chief Counsel, Roderick B. Cassidy, Assistant Chief Counsel, J. Thomason Phelps, Principal Counsel, and Elmer J. Sjostrom, Assistant Counsel, for Respondents.

DOOLING, J.—The Public Utilities Commission on June 4, 1958, instituted an investigation on its own motion into the operations and practices of Babe Talsky doing business as Reliable Delivery Service. The business was operated as a sole proprietorship from 1936 to August 1959, when it was incorporated as Reliable Delivery Service, Inc., with Talsky as the sole stockholder. Following hearings in 1958 and 1959, the commission on October 6, 1959, entered its order directing Talsky and the corporation to cease and desist from operating as a highway common carrier between a large number of designated cities unless and until they obtained a certificate of public convenience and necessity authorizing such operations. The order also suspended for 20 days their permits to operate as a radial highway common carrier and as a highway contract carrier.

In the present proceeding Talsky and the corporation challenge the jurisdiction of the commission to curtail their operations. The controversy centers upon the sufficiency of the evidence to support the commission's order.

Talsky commenced trucking operations in January 1936, when he obtained a highway contract carrier permit. In April 1944, he obtained a radial highway common carrier permit, and in September 1956 a certificate of public convenience and necessity to transport certain limited commodities between all points in a prescribed area of Southern California. The challenged operations were between points not covered by this certificate and it is in no way involved in these proceedings. Talsky transferred these permits and the limited public convenience certificate to Reliable Delivery Service, Inc., upon its incorporation in August 1959.

The trucking equipment consisted of 65 trucks, 26 tractors, 38 trailers, 4 converter gears, and 3 service cars. The certificated operations were conducted on both a scheduled operation basis and an on-call basis six days a week, Monday through Saturday (with deliveries only on Saturday). The permitted operations were conducted on an on-call basis each week, and pickups were available from Monday through Friday, with deliveries only also on Saturday.

Since the basic question is the sufficiency of the evidence to support the commission's order and in view of the course which the commission's hearing took, a rather detailed statement thereof cannot be avoided. The first hearing was held on September 16, 1958. At that hearing the commission produced A. M. Post, an assistant transportation representative of the commission. Post's testimony is here summarized: On March 4, 1958, he had a conversation with petitioner Talsky. Talsky told Post that "he would haul anything for anybody to any points which he serves . . . he had hauled less than truckloads, any weights, for any shipper to or from any points into which his equipment operated or which he served . . . he would accept any shipments tendered to him into points which he served." Post asked Anderson and Talsky how they would happen to secure radial shipments. "They stated that they were tendered shipments, they would accept shipments to points into which they were going and if they saw any volume of business being developed on radial shipments, they would attempt to secure a contract from the shipper. . . . Mr. Anderson stated further that they had not had time to secure a number of contracts that they felt possibly were contract shipments." When Post first asked Talsky about the details of his operations, "he requested that Mr. Anderson (his office manager) be present, saying that Mr. Anderson had complete knowledge of the billing procedures, the method of bookkeeping, the method of identifying bills; and Mr. Talsky did not want to discuss the freight bill procedure and the identification of exhibits without Mr. Anderson's presence." At Post's request Anderson submitted to him all freight bills for the three-month period, November and December 1957 and January 1958. It was Talsky's practice to stamp all freight bills on shipments handled pursuant to his permitted authority either "R" for radial shipment or "C" for contract shipment. Post asked Anderson for all of his written contracts and Anderson gave him 38. He asked Anderson if there were any oral contracts and Anderson said there was only one. In reply to a question whether the 38 contracts submitted were "all of the contracts you have," Anderson said "yes." After reviewing the freight bills for the three-month period, Post chose two five-day periods, November 12-18, 1957, and January 21-27, 1958, as representative. For these two five-day periods he made a detailed analysis which he reduced to the form of a chart, which was introduced into evidence. A summary of the find-

ings disclosed by this chart appears in the opinion of the commission, and is set forth in the footnote.[1]

This summary indicates that only 29 per cent of petitioners' shipments to and from the points in question during the period covered was made pursuant to one of the 38 written contracts submitted by Anderson to Post.

Anderson in rebuttal at the first hearing denied portions of Post's testimony, but since the commission chose to believe Post this testimony need not be detailed. He did testify that in addition to the 38 written contracts furnished to Post, there were six or eight written contracts that Talsky had at home which he had not known about when he gave Post the 38. He further testified that they had had many oral contracts with other shippers whose shipments had been marked "R" because he was not sure that the commission would recognize oral contracts. Two additional groups of written contracts were identified by Anderson and introduced into evidence. Thirty writings were in the first group (Exhibit 5) and 62 writings in the second (Exhibit 6). Of the 30 in Exhibit 5,

| Footnote [1] Point of Origin | Point of Destination | No. of shipments 10 das. | No. das. shipments carried | No. shipments per written contract | No. shipments no written contract | No. parties employing respondent Contract | No Contract |
|---|---|---|---|---|---|---|---|
| San Bernardino | Banning | 26 | 10 | 0 | 26 | 0 | 6 |
| | Palm Spgs. | 83 | 10 | 15 | 68 | 4 | 13 |
| | Hemet | 50 | 10 | 7 | 43 | 2 | 8 |
| | Perris | 12 | 10 | 0 | 12 | 0 | 3 |
| | Lancaster | 22 | 9 | 6 | 16 | 3 | 3 |
| | Victorville | 41 | 9 | 10 | 31 | 5 | 13 |
| | Barstow | 32 | 10 | 8 | 24 | 4 | 9 |
| | Big Bear Lk. | 24 | 10 | 4 | 20 | 2 | 4 |
| | Indio | 23 | 9 | 3 | 20 | 2 | 7 |
| | San Jacinto | 14 | 9 | 1 | 13 | 1 | 4 |
| Los Angeles | Lancaster | 96 | 10 | 33 | 63 | 6 | 32 |
| | Palmdale | 46 | 10 | 12 | 34 | 4 | 24 |
| | Apple Val. | 36 | 10 | 13 | 23 | 3 | 7 |
| | Victorville | 49 | 10 | 33 | 16 | 4 | 13 |
| | Palm Spgs. | 107 | 10 | 65 | 42 | 3 | 24 |
| | National City | 19 | 10 | 0 | 19 | 0 | 13 |
| | Lake Arrowhead | 12 | 8 | 0 | 12 | 0 | 4 |
| | Barstow | 36 | 10 | 22 | 14 | 5 | 10 |
| | Cathedral City | 13 | 9 | 0 | 13 | 0 | 4 |
| | Indio | 28 | 10 | 12 | 16 | 2 | 12 |
| | Escondido | 16 | 9 | 0 | 16 | 0 | 16 |
| | La Mesa | 9 | 7 | 0 | 9 | 0 | 8 |
| | El Cajon | 20 | 9 | 0 | 20 | 0 | 6 |
| | Chula Vista | 19 | 8 | 0 | 19 | 0 | 13 |

four have dates in 1956 and 1957 (possibly the "six or eight" that Anderson testified that Talsky had at home?), 14 bore dates in 1958 prior to March 4 and the others have dates later than March 4, 1958. The 62 documents in Exhibit 6 all bear dates subsequent to June 4, 1958.[2]

It is a fact of possible significance, in view of petitioners' claim that the bulk of the written contracts in Exhibits 5 and 6 are written confirmations of prior oral contracts, that all of such documents which purport to have been executed prior to 1958 are on a printed form making no reference to any prior oral agreement,[3] while all purporting to be executed in 1958 are on a different printed form expressly purporting to reduce to writing a prior oral agreement.[4]

After these writings in Exhibits 5 and 6 had been introduced a continuance was requested to enable counsel representing the commission to interview the parties to the alleged written contracts to ascertain the bona fides of the references therein to prior oral contracts, it being frankly stated that the possibility of an attempt to manufacture evidence should be explored. Such continuance was granted, and in view of petitioners' argument before this court that the witnesses later produced were all from one area and were not properly representative, a portion of the statement of petitioners' counsel made at that time is here reproduced: "I don't think we need witness after witness after witness if it is obviously going to be a duplication of witnesses. They can contact these people. They can certainly ask any person the questions, if I understand the purpose, and I am very anxious to have them come in and tell you why."

At the subsequent hearings the commission called various shippers to testify regarding their contractual arrangements with Talsky, allegedly on an oral basis during the period under investigation but later reduced to writing: (1) John Quiroz for Electric Corporation of California signed a contract with Reliable Delivery Service dated May 1, 1958. He testified that he had an oral agreement as of November 15,

---

[2]The significance of the dates is that on March 4, 1958, Post started his investigation and on June 4, 1958, the commission commenced its formal proceedings.

[3]This printed form commences: "This will confirm our understanding this date covering an agreement between Babe Talsky, doing business as Reliable Delivery Service, hereinafter designated as Carrier, and your company, as Shipper Consignee."

[4]"This will reduce to writing our oral agreement as of ———, 195— between Babe Talsky, etc."

1957, with Talsky, providing simply that he would use Talsky so long as the latter would give him "a late pickup and good delivery the next day," but there was no arrangement for furnishing Talsky any certain volume of traffic or covering any specified service between definite towns; that he signed the written contract because Talsky "asked me if I would and he had been making pickups and giving good service so I signed it for him"; that he did not realize that the written contract provided for his giving a "minimum of 1500 pounds" a month to Reliable Delivery Service; that he did not know what date he signed the contract; that he used Talsky's delivery services to points other than those covered in the contract and there was no difference in the various services furnished by Talsky; that the provision for the designated 1,500 pounds of freight per month was flexible rather than an absolute minimum provision in that if he did not meet that freight specification, Talsky would not charge him "for [the] extra weight to make up for the 1500" but it might be made up in other months; and that when Talsky brought in the written contract to sign, he was busy, had no time to talk about specifications in the contract, gave the contract "a quick glance" and just signed it.

(2) J. C. Afflick for Graybar Electric Company, Inc., signed a contract with Talsky dated April 1, 1958; it was a "30 day contract," cancellable in 30 days; and it referred to an oral contract of December 12, 1956. He testified that he read the contract and "knew it was binding"; that if he should fail to give Talsky the designated minimum freight of 35,000 pounds of traffic, he would be willing to pay the penalty but he knew Talsky would not so charge him because he "would pay" and then "be through with [Talsky]"; that he knew Talsky would never enforce that minimum monthly shipment provision, and that he felt absolutely free to "knock off" Talsky's services at any time the "service fell down." On cross-examination, Afflick testified that he considered the written contract "binding" but at the same time Afflick stated that he felt that he had the "right to discontinue [it] at any time." On redirect examination, Afflick testified that he relied on his many years of dealing with Talsky as ground for Talsky not enforcing any minimum freight provision, being more or less of an "inducement" for him to sign the contract. Afflick also testified that he could not remember the terms of the oral contract of December 12, 1956, which the written contract purported to reduce to writing; that he did not know whether

the oral contract was binding: "I couldn't say. I wouldn't say." He further testified that at the time he presented the written contract Talsky told him that his signature on the contract was necessary in his application proceeding to the commission.

(3) Vern Dahl, office manager of Howard Fletcher Company, signed a written contract with Talsky dated January 21, 1958. He testified that so far as he could remember, he signed the contract in September 1958; that he signed it only after telling Talsky: "This contract which you bring to me here I want it understood that it is not binding in any sense or form or otherwise I will not sign it"; that he had no knowledge of any oral agreement of December 12, 1956, that the later executed written contract was supposed to represent, but such oral agreement might have been made with a warehouse foreman; that while the written contract called for minimum freight of 30,000 pounds of traffic per month, he signed with the "verbal understanding that the contract was not binding."

(4) Charles Cisco, auditor for Dill Lumber Company, testified that in early September 1958 during the truckers' strike in Southern California a representative from Reliable came to his office and asked him to sign a contract to "allow [Reliable] to obtain a legal franchise to come into the Palm Springs area"; that before he signed the contract he asked "what [the contract] tied us down to" and he was told that notwithstanding "any of the written statements in the contract," "it tied us to nothing" and that he would not have signed the contract if the contract were to be deemed "binding"; that while the written contract allegedly reduced an oral agreement of August 19, 1957, to writing, he himself did not know of the existence of such oral agreement.

(5) Frank Cavanaugh, an electrical contractor, signed a contract with Reliable during the truckers' strike, September 3, 1958. He testified that Reliable's representative presented the document to him to sign on the basis of "we need the document signed to be able to deliver freight to you"; that the contract recited an "oral contract of December 2, 1957," but he could not recall such an oral understanding; that he signed without actually reading the contract, as he was in a "bind" on getting freight shipments on account of the truckers' strike.

(6) Bill Murphy, a pharmacist, testified that one of Reliable's drivers presented the contract to him for signature;

that he had good service from Reliable and signed on that basis; that he never had "any oral agreement" previously with Reliable; that he didn't read the contract and Reliable's representative said that "it was just a signature, that there would be no expense incurred by me if I did not fulfill the contract."

(7) Elmer Hutt, a pharmacist, testified that he signed the contract during the truckers' strike in September 1958; that he did not remember any previous oral agreement; that he liked the Saturday service furnished by Reliable; that Reliable's driver presented the contract and he read it before signing; that the driver said that it was not a "binding situation."

(8) Bud Wixom for Hollostone Building Materials testified that one of his former employees signed the contract with Reliable without authority; that he never knew of any oral agreement with Reliable; that he did not see the written contract until several months after its execution.

(9) John Ferchaud for San Jacinto Pharmacy signed a contract with Reliable on the basis it was necessary so that Reliable "could continue to be able to deliver to" that area. He testified that he never knew of any prior oral contract; that while the contract had two pages, he only saw and signed the second and "did not see the first page . . . until later (a month)."

(10) Glenn Shockley, manager of Dill Lumber Company at Banning, testified that he signed a contract with Reliable dated September 3, 1958, during the truckers' strike; that there was no prior oral contract; that he did not discuss with Reliable's representative the "binding" effect of the contract but was told that the contract had to be signed so that deliveries could be continued.

(11) R. W. Hills for Desert Pipe and Hardware, Cathedral City, signed a contract with Reliable dated September 3, 1958. He testified that Reliable's representative presented the contract for signature on the basis that Reliable needed it to get a franchise to deliver in the Palm Springs area; that he only saw the second page when he signed and did not see the first page until some three weeks later when the commission's representative showed it to him; that he knew nothing about any "obligations" imposed under the terms of the first page as to furnishing "a given amount of freight"; that a few days later a representative from Reliable came to see him and told

him the contract "was not binding and . . . not [to] worry about it."

(12) William A. Francisco, a pharmacist, testified that he had never had an oral agreement with Reliable; that one of his clerks may have signed a written contract without authority.

(13) Sherman McIntosh for McIntosh Pharmacy signed a contract presented by a representative from Reliable with the understanding "there was nothing binding to the paper."

(14) Mrs. Gladys Bonfils for Bonnie's Electric and Appliance signed a contract presented by Reliable's driver in the fall of 1958. She testified that it was presented on the basis that Reliable needed "signed statements from people [Reliable] had been serving to show that their service was satisfactory, and that they could continue"; that previously there had been no specific oral agreement; that she did not read "all of it" before signing; that she did not know that by signing the contract she was obligating herself to ship a certain amount of freight per month, and she would not have signed if she had understood such obligation.

(15) Donald J. Derbes, general manager and secretary of Palm Springs Builders Supply Company, signed with Reliable on September 3, 1958. He testified that it was not so much a contract as an "authorization" that Reliable would be able to present to the suppliers to show satisfaction with Reliable's service; that he would not have signed the contract if he had understood "there was a binding provision requiring . . . a specified amount of tonnage per month"; that he "glanced" at the contract, saw nothing "binding" about it, and Reliable's representative assured him it was not.

(16) Joe Wood, salesman for Campbell Electric Company, testified that he signed a document in the belief that it "was an affidavit" attesting to prompt delivery and efficiency but he had no authority to enter into contracts or bind the company to provide 1,500 pounds of shipping a month as the company "does not do that much shipping."

Ray J. Thompson was the only signer of one of the 1958 written contracts called on behalf of Talsky. He testified that he signed a contract with Reliable dated September 4, 1958; that both he and Reliable "have endeavored to abide by the conditions of the agreement"; that he entered into the contract "with good faith." On cross-examination Thompson testified that he specified with his consignors to use Reliable because the service was dependable; that there was no differ-

ence between the service from Reliable prior to signing the contract and that after signing (a daily frequency service as a common carrier); that he previously had an oral agreement with Reliable to pick up all his shipments but "no agreement as to . . . so many thousand pounds or price or anything."

Talsky testified on his own behalf. He was specifically questioned about the Quiroz contract. He stated that he went over the contract's terms with Quiroz; that he (Talsky) signed the agreement "in good faith" and that he intended to "hold . . . to the minimum" as provided in the agreement; that he explained the "penalty" to Quiroz and Quiroz stated that he had authority to enter into the agreement. On cross-examination, Talsky testified that for some six years prior to the contract's date, May 1, 1958, there was an oral arrangement for delivery service; that beginning about November 15, 1957, it was decided that there should be a contract instead of "hauling pursuant to [a] radial highway common carrier permit" because they were delivering into the area more than three times a week; that then the November 15, 1957, oral agreement was made and subsequently reduced to writing May 1, 1958; that he never told Quiroz that the contract was not binding on him.

Talsky testified generally as to his procedure in getting the contracts signed; for example, the contract with Cisco, that he discussed all the terms thereof; that he would serve shippers between Los Angeles and Palm Springs two times a week or less on a "radial" basis and three times a week or more on a "written contract" basis; that he never represented to Cisco that he only wanted the contract signed to help "get proper authority from the . . . Commission" and that he never told Cisco that "the contract was not binding." Talsky maintained that he never told any of the witnesses who had previously testified that the contracts were not binding, and that he entered into all the agreements "in good faith."

Reviewing the record thus made: At the conclusion of Post's testimony, and based thereon, the commission was entitled to believe and find that as to the services under investigation petitioners held themselves out to serve the public generally between any points where they had a regular service; that they had a regular service, in most cases five days per week and in no case less than seven days out of 10, between all of the points covered by Post's survey during the 10-day period which he had analyzed; and that during that 10-day

period 71 per cent of all shipments was made by shippers with whom petitioners had no contract.

■ To counter this showing petitioners produced written contracts, most of which were executed after the commission's inquiry was instigated, purporting to reduce to writing oral contracts in existence before November 1957, the starting date of the operations under investigation. The commission in rebuttal produced 16 signers of such contracts whose testimony was ample to support the finding that the so-called prior oral contracts were a sham, and that the written contracts were not in fact bona fide but actually executed in an attempt to manufacture evidence. In surrebuttal petitioners produced one signer whose testimony as to the prior oral contract was so weak that the commission could reasonably find that no real or enforceable oral contract had existed. The net effect of the whole proceeding is that the commission could, as it did, disbelieve the claim of prior oral contracts and believe the testimony given by the investigator Post.

■ The common-law test of common carriage requires an unequivocal intention to dedicate the property to public use, and the "substantial restrictiveness" test formerly attempted to be applied by the commission is not sufficient to establish that a carrier is a common carrier in the absence of such unequivocal intention to dedicate its property. (*Souza* v. *Public Utilities Com.*, 37 Cal.2d 539 [233 P.2d 537]; *Samuelson* v. *Public Utilities Com.*, 36 Cal.2d 722 [227 P.2d 256].) ■ A "highway contract carrier" is not a public carrier, but both a "radial highway common carrier" and a "highway common carrier" are common carriers, the difference being that the radial common carrier does not, while the highway common carrier does, operate between fixed termini or over a regular route. (*Alves* v. *Public Utilities Com.*, 41 Cal.2d 344, 350 [260 P.2d 785].) ■ There is some unfortunate uncertainty in the law in this field due to the fact that a "highway contract carrier" is only defined by exclusion as "every highway carrier other than (a) a highway common carrier, (b) a radial highway common carrier, (c) a petroleum contract carrier, or (d) a petroleum irregular route carrier" (Pub. Util. Code, § 3517), and so long as the carrier remains a true contract carrier it may operate over a regular route or between fixed termini. (*Alves* v. *Public Utilities Com.*, *supra*, 41 Cal.2d at p. 350.) ■ However, if the carrier does operate regularly between fixed termini, as here, and does hold itself out to serve the public generally, as

the commission found here on sufficient although conflicting testimony that petitioners did, it is in fact a highway common carrier although a portion of its business may be with shippers with whom it has contracts. (*Nolan* v. *Public Utilities Com.*, 41 Cal.2d 392, 396-397 [260 P.2d 790].)   ▆▆ The following quotation from Nolan aptly fits the testimony of Talsky and Anderson in this case that whenever the operation exceeded two days per week between the same termini they *attempted* to secure a contract: "Here the evidence is abundant that Nolan intended to continue operating as a common carrier but to avoid the consequences of expanding operation by entering into contracts with those shippers whose freight he carried on his trucks with regularity to certain termini. This is sufficient to sustain the finding that all of his operations, whether by contract or otherwise, were common carriage." (41 Cal.2d at p. 397.)

Equally the claim that the operations here in question could be justified as radial common carriage is not tenable. ▆▆  The extent of the noncontract business shown by Exhibit 3 between fixed termini brings the case well within the following statement from Nolan: "Nolan's contention that a radial highway common carrier does not become a highway common carrier when business expansion results in regular trips to certain communities is without merit. By statutory definition, the distinction between the two types of carriers is that the highway common carrier operates between fixed termini or over a regular route whereas the radial carrier has no fixed termini or regular route." (41 Cal.2d at p. 397.)

We are satisfied from our review of the evidence that the commission's finding that petitioners operated as a highway common carrier between all the points in question finds support in the evidence.

▆▆  Petitioners attack the order of suspension of their radial and contract carrier permits for 20 days. The suspensions are authorized by section 3774, subdivisions (a) and (b), of the Public Utilities Code.[5] While we cannot interfere with the discretion conferred on the commission by this section, it would seem that the commission might well consider the reduction or amelioration of this penalty in view of the

---

[5]Section 3774: "The commission may cancel, revoke, or suspend the operating permit or permits of any highway carrier upon any of the following grounds:

"(a) Any illegally conducted highway carrier operations.

"(b) The violation of any of the provisions of this chapter, or of any operating permit issued thereunder."

considerable doubt which has existed as to the exact extent of the operations which may be legally engaged in under radial and contract highway carrier permits.

The order is affirmed.

Gibson, C. J., Traynor, J., Peters, J., and White, J., concurred.

McCOMB, J.—I dissent. The statute here involved is too uncertain and indefinite to warrant the imposition of the penalty imposed by respondents on petitioners.

The rule is well stated by Mr. Justice Traynor in *Perez* v. *Sharp*, 32 Cal.2d 711 [198 P.2d 17], which held unconstitutional a statute declaring void marriages between white persons with Negroes, Mongolians, members of the Malay race, or mulattoes. He said at page 730: "To determine that a person is a Mongolian or Malayan within the meaning of the statute because of any trace of such ancestry, however slight, would be absurd. If the classification of a person of mixed ancestry depends upon a given proportion of Mongolians or Malayans among his ancestors, how can this court, without clearly invading the province of the Legislature, determine what that decisive proportion is? [Citation.] Nor can this court assume that a predominance in number of ancestors of one race makes a person a Caucasian, Mongolian, or Malayan within the meaning of the statute, for absurd results would follow from such an assumption. Thus, a person with three-sixteenths Malay ancestry might have many so-called Malay characteristics and yet be considered a white person in terms of his preponderantly white ancestry. Such a person might easily find himself in a dilemma, for if he were regarded as a white person under section 60, he would be forbidden to marry a Malay, and yet his Malay characteristics might effectively preclude his marriage to another white person. Similarly, a person having three-eighths Mongolian ancestry might legally be classed as a white person even though he possessed Mongolian characteristics. He might have little opportunity or inclination to marry any one other than a Mongolian, yet section 60 might forbid such a marriage. Moreover, if a person were of four-eighths Mongolian or Malayan ancestry and four-eighths white ancestry, a test based on predominance in number of ancestors could not be applied.

"Section 69 of the Civil Code and section 60 on which it is based are therefore too vague and uncertain to be upheld

as a valid regulation of the right to marry. Enforcement of the statute would place upon the officials charged with its administration and upon the courts charged with reviewing the legality of such administration the task of determining the meaning of the statute. That task could be carried out with respect to persons of mixed ancestry only on the basis of conceptions of race classification not supplied by the Legislature. *'If no judicial certainty can be settled upon as to the meaning of a statute, the courts are not at liberty to supply one.'* [Citation.]'' (Italics added.)

Applying the foregoing rule to the facts of the present case, it is impossible, as recognized by all parties, to determine from the legislative enactment whether petitioner was engaged as a ''highway contract carrier'' or a ''common carrier.''

The record discloses that petitioner Babe Talsky has been engaged in the trucking business since he obtained a highway contract carrier permit in 1936. He was given a radial highway common carrier permit in April 1944, and in September 1956 obtained a certificate of convenience and necessity to transport certain named commodities between all points in a prescribed area of Southern California.

Petitioner Talsky operated and conducted the business as a sole proprietorship under the name of Reliable Delivery Service until the incorporation of petitioner corporation in August 1959, at which time he transferred to the corporation certain assets and liabilities of the sole proprietorship, including the two permits and certificated authority above mentioned, in exchange for all the stock of the corporation. (Petitioners will hereinafter be referred to collectively as ''petitioner.'')

The present operations of petitioner are conducted with 65 trucks, 26 tractors, 38 trailers, four converter gears, and three service cars.

Petitioner's certificated operations are conducted on both a scheduled operation basis and on an on-call basis, with operations being conducted six days a week, Monday through Saturday (the Saturday service consisting of deliveries only). The permitted operations are conducted on an on-call basis each week.

Petitioner has some 130 written contracts with shippers and/or consignees located throughout petitioner's service area. Thirty-eight of them were entered into prior to March 4, 1958, the date on which a representative of respondent Public Utilities Commission (hereinafter referred to as ''respondent

commission'') first inspected petitioner's records, and the other 92 were entered into later, purportedly to confirm oral agreements in existence before that time.

A chart prepared by respondent commission showed that only 29 per cent of petitioner's shipments during the period covered were made pursuant to one of the 38 written contracts entered into prior to March 4, 1958.

The written contracts are applicable to the non-certificated operations, viz., transportation movements under petitioner's permitted authorities. Petitioner also has oral agreements with shippers and/or consignees having movements of general commodities outside the scope of petitioner's certificated authority operations.

Petitioner's certificated operations have been performed under authority of Public Utilities Commission Decision No. 53751 within the area therein described. Petitioner has conducted operations between points other than those set forth in the certificate under authority of the highway contract carrier permit and radial highway common carrier permit heretofore mentioned.

After an investigation begun in 1958 and hearings held in 1958 and 1959, respondent commission found that petitioner was operating as a highway common carrier between certain prescribed termini in an area not covered by the certificate of convenience and necessity, and ordered petitioner to cease and desist from operating any auto truck as a highway common carrier between such termini until a certificate of convenience and necessity authorizing such operation had been obtained. In addition, it ordered that the radial highway common carrier permit and the contract carrier permit hereinabove mentioned be suspended for a period of 20 days.

Petitioner contends that the questioned operations were not those of common carriage but, rather, contract carriage made under the highway contract carrier permit.

This is the sole question necessary to be determined: *Is there in California any clear formula which can be applied to determine the point at which there is evidence of a holding out to serve the public indiscriminately and the dedication necessary to constitute a carrier a common carrier?*

*No.* A ''highway carrier'' is ''every corporation or person . . . engaged in transportation of property for compensation or hire as a business over any public highway in this State by means of a motor vehicle. . . .'' (Pub. Util. Code, § 3511.) A ''common carrier'' is not defined in the Public

Utilities Code, but this court has determined the test applicable to determine what under the common law constituted a common carrier. It is an unequivocal intention to dedicate private property to a public use. (*Samuelson* v. *Public Utilities Com.*, 36 Cal.2d 722, 733 [2] [227 P.2d 256].)

There has been no clear formula established in California which can be applied to determine whether the dedication necessary to isolate the common carrier is present, no method of deciding the exact point at which a private carrier becomes a public servant, and no circumstances which invariably constitute a "holding out to serve the public indiscriminately." (*Cf. Public Utilities Regulation*, 30 So.Cal.L.Rev. 131 (1957).)

An attempt was made by the Public Utilities Commission to formulate a workable test in *Pacific Southwest Railroad Ass'n* v. *Nielsen*, 49 P.U.C. 216. The commission there stated that a carrier must have objectively manifested an intent to substantially restrict his business in order to avoid being classed as a common carrier.

This court found, however, without proposing any other method for determining dedication, that the "substantial restrictiveness" doctrine excludes or at least reduces the unequivocal intention to dedicate to only incidental importance and therefor abrogates the common law test. (*Samuelson* v. *Public Utilities Com., supra.*)

The law was left in an uncertain state. It appeared that contract carriage was a broader field than the commission had supposed. How broad no one could say. (*Regulation of Truckers*, 41 Cal.L.Rev. 63, 86 (1953).)

Since the questioned shipments were on a daily basis between "fixed termini and/or over a regular route," they could not have been lawfully made under petitioner's radial highway common carrier permit (*Nolan* v. *Public Utilities Com.*, 41 Cal.2d 392, 397 [7] [260 P.2d 790]) and were legal only if made under petitioner's highway contract carrier's permit. A highway contract carrier (defined in the code by exclusion only) means "every highway carrier other than (a) a highway common carrier, (b) a radial highway common carrier, (c) a petroleum contract carrier, or (d) a petroleum irregular route carrier." (Pub. Util. Code, § 3517.)

If a carrier for hire can show he is not a common carrier, a petroleum contract carrier, or a petroleum irregular route carrier, he is a "highway contract" carrier, although he may not have executed a single contract. The difficulty in this field

appears to be the determination of the point at which a radial highway common carrier's operations between two points become so frequent that they stop being merely radial because between "fixed termini."

In the Nolan case, *supra*, this court held that a carrier whose shipments between two points were *daily* had ceased to be "radial." The question then arises, Would shipments between the same two points occurring four times a week, or three times a week, still be "radial"? Once the carriage ceases to be "radial," the carrier must either obtain a contract or secure a certificate as a highway common carrier.

Petitioner correctly contends that there is a great deal of uncertainty on the part of respondent commission as to what distinguishes a "radial" from a "contract" operation. On several occasions he unsuccessfully attempted to secure a determination by respondent commission as to the lawfulness of his operations prior to March 4, 1958.

This position is fully supported by respondent commission itself, which, in an attempt to draw the Legislature's attention to the conflicts between the Highway Carriers' Act and the Public Utilities Act, said: "Based upon years of experience in administering these two Acts, we have no hesitancy in saying that from a practical standpoint a given operation by a permitted carrier may be said to be that of a highway common carrier under the Public Utilities Act unlawfully operating without a certificate and at the same time that of a radial highway common carrier, or even a contract carrier, under the Highway Carriers' Act. . . . Even as a practical matter, all must agree that a given operation cannot be two different things at one and the same time and be subject to two different standards of regulation, each conflicting with the other, if efficiency, reality and successful administration are to be achieved." (Decision No. 50448, Case No. 5478, 53 P.U.C. 366, 379 (1953).)

The facts in the present case bring it within the rule that a statute which either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess as to its meaning and differ as to its application violates the first essential of due process of law. (*In re Newbern*, 53 Cal.2d 786, 792 [9] [350 P.2d 116] ; *Katzev* v. *County of Los Angeles*, 52 Cal.2d 360, 370 [11] [341 P.2d 310]; *Wotton* v. *Bush*, 41 Cal.2d 460, 464 [1] [261 P.2d 256].)

Hence, since the law which petitioner was found guilty of violating lacked a reasonable or definite standard, the deter-

mination of the illegality of petitioner's acts and the assessment of a penalty in the same proceeding deprived him of due process of law.

I would annul respondent commission's decision.

Schauer, J., concurred.

Petitioners' application for a rehearing was denied July 26, 1961. Schauer, J., and McComb, J., were of the opinion that the application should be granted.